# FIRST NATIONAL BANK OF MOBILE d/b/a Bankamericard/Visa, Plaintiff-Appellant,

v.

## Harold Eugene RODDENBERRY and Jayne Hettie Roddenberry, Defendants-Appellees.

No. 81–7952.

United States Court of Appeals, Eleventh Circuit.

April 1, 1983.

Lawrence B. Voit, Mobile, Ala., for plaintiff-appellant.

Stephen M. Gudac, Mobile, Ala., for defendants-appellees.

Before HILL and ANDERSON, Circuit Judges, and LYNNE *, District Judge.

JAMES C. HILL, Circuit Judge:

This appeal raises the important and timely issue of when liabilities resulting from abuse of bank credit cards are exempt from general discharge through bankruptcy proceedings. In *Davison-Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir.1940), *cert. denied*, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed.

---

* Honorable Seybourn H. Lynne, U.S. District Judge for the Northern District of Alabama, sitting by designation.

1523 (1941), a divided panel of the former Fifth Circuit concluded that the purchase of goods on credit, with an intentional concealment of insolvency at the time of purchase, was not exempt from general discharge. Upon reviewing the scope of *Davison-Paxon,* we conclude that the rule enunciated in the decision does not warrant mechanical application. Instead, each case involving modern credit transactions must be examined individually to determine if the challenged liability is of the type anticipated to be discharged in *Davison-Paxon.* It is our conclusion that in transactions involving bank credit cards the analysis must involve a determination of whether the bank unconditionally revoked the cardholder's right to use and possession of that card and if so when the cardholder became aware of such revocation. Debts incurred prior to unconditional revocation may be dischargeable. However, debts incurred with the knowledge that one is not entitled to possession or use of a credit card are nondischargeable.

## I.

In November 1975, Harold and Jayne Roddenberry applied for a joint Bank Americard with the First National Bank of Mobile. Their application was approved, and they were issued two credit cards with a total credit limit of $400. In January 1978, their credit limit was automatically extended to $600. This extension was pursuant to an across-the-board increase to all credit customers in good standing. In May 1978, their limit again was extended to $1,000, this time at the request of the Roddenberrys.

By April 21, 1978, however, the Roddenberrys already had an outstanding balance on their account of $1,620.41. Thus, on May 5, 1978, the bank mailed its first form letter to the Roddenberrys informing them that they had exceeded their credit limit and requesting that no further charges be made until the balance was reduced to a permissible level. A similar form letter was mailed to the Roddenberrys on May 19, 1978. Al-

though payments to the bank in June and July reduced the account's balance to $1,078.32, in August, the balance began to rise once again. Thus, a third form letter was mailed on August 25, 1978.

In September 1978, an official of the bank's credit department telephoned the Roddenberrys. During one such conversation, Mr. Roddenberry promised that he would make no further charges on the account. Mr. Roddenberry apparently kept his promise. In October 1978, however, the couple separated, and Mrs. Roddenberry moved away, taking with her both of the credit cards. It is not disputed that all charges on the account after September 1978 were made by Mrs. Roddenberry.

Upon leaving her husband, Mrs. Roddenberry embarked on what can only be characterized as a credit card spending spree. From September through November she obtained $1,300 in cash advances from the bank's automatic teller. The bank therefore telephoned the Roddenberrys who promised to pay the $2,583.17 account in full within one week from November 21, 1978. When payments were not forthcoming, the bank maintains that it tried to contact the Roddenberrys by leaving messages on the Roddenberrys' telephone answering recorder.

Not until December 11, 1978, did the bank finally program its automatic teller to pick up the credit cards if they were used to obtain a cash advance. In addition, on December 12, 1978, the bank claims that the National Authorization Center for BankAmericard/VISA was advised to instruct any merchant calling for an authorization to pick up the cards.[1] The December balance on the Roddenberrys' account was $3,098.92.

After December, Mrs. Roddenberry did not attempt to obtain any further cash advances. Instead, she engaged in the creative practice of purchasing items less than $50.00 in value. By making numerous small purchases, Mrs. Roddenberry was able

---

1. The bankruptcy court made no specific findings with respect to when and if the automatic tellers were reprogrammed or when or if the authorization center was notified.

to use her charge cards without detection because merchants generally are required to call-in for authorization only if the total purchase price of a sale exceeds $50.00. Thus, in January 1979, Mrs. Roddenberry successfully made 91 separate charges, each for less than $50.00. This raised the balance on the Roddenberrys' account to $5,221.77 as of January 22, 1979.

The bank again contacted Mr. Roddenberry in January. At that time, he assured the bank that he would try to recover the cards from his estranged wife. When Mr. Roddenberry did speak with his wife, he apparently informed her that she was not to make any further charges with the credit cards. However, Mrs. Roddenberry told her husband that she needed the cards to "live on" until she could find a job. She testified that she used the cards to buy merchandise for friends, who in turn would pay her the cash she used to support herself.

On March 2, 1979, the Roddenberrys filed petitions for bankruptcy. The balance of their credit card account as of the date of filing was $7,050.55, but Mrs. Roddenberry continued to make purchases with the credit cards even after the bankruptcy petitions were filed.[2] The bank subsequently filed a complaint seeking to have the debts declared nondischargeable because the money and merchandise were obtained under false pretenses within the meaning of section 17a(2) of the former Bankruptcy Act. 11 U.S.C. § 35a(2) (1976). Relying on *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), *cert. denied,* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), the bankruptcy court held that the debts incurred prior to bankruptcy filings were dischargeable because they were not obtained by means of actual overt false pretenses or representations. Those charges incurred after the filings, on the other hand, were not dischargeable. The district court affirmed.

## II.

Section 17a(2) of the Bankruptcy Act of 1898 provides a limited exception to the general discharge of debts in bankruptcy. If the challenged liabilities are "for obtaining money or property by false pretenses or false representations," then the debts are not dischargeable through bankruptcy proceedings. 11 U.S.C. § 35a(2) (1976).[3] Un-

---

**2.** The balances for the Roddenberrys' account were as follows:

| Statement Closing Date | Account Balance |
|---|---|
| 1/21/78 | $ 1,187.94 |
| 2/21/78 | 1,243.39 |
| 3/21/78 | 771.22 |
| 4/21/78 | 1,620.41 |
| 5/21/78 | 1,672.55 |
| 6/21/78 | 1,079.59 |
| 7/21/78 | 1,078.32 |
| 8/21/78 | 1,249.79 |
| 9/21/78 | 2,169.09 |
| 10/20/78 | 2,400.77 |
| 11/21/78 | 2,583.17 |
| 12/21/78 | 3,098.92 |
| 1/21/79 | 5,221.77 |
| 2/21/79 | 6,507.95 |
| 3/21/79 | 7,150.53 |

**3.** This case is governed by the Bankruptcy Act of 1898 because the Roddenberrys' bankruptcy petition was filed prior to the effective date of the Bankruptcy Code of 1978. Section 17a of the former statute reads in pertinent part as follows:

§ 17 Debts Not Affected by a Discharge.
a. A discharge in bankruptcy shall release a bankrupt from all of his provable debts, whether allowable in full or in part, except such as ... (2) are liabilities for obtaining money or property by false pretenses or false representations....

This provision has been recodified at 11 U.S.C. § 523(a)(2)(A) which reads:

§ 523. Exceptions to discharge
(a) A discharge under section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—
(2) for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition....

Although the recodified version is substantially identical to section 17a, *Brown v. Felsen,* 442 U.S. 127, 129 n. 1, 99 S.Ct. 2205, 2208 n. 1, 60 L.Ed.2d 767 (1979), Congress has incorporated certain modifications which may alter the outcome in certain cases where debtors obtain credit without a present intention of repayment. *See generally* Rendleman, *Liquidation Bankruptcy Under the 78 Code,* 21 Wm. & Mary L.Rev. 575, 687–88 (1980). Indeed, one commentator suggests that Congress' addition of the term "actual fraud" to the "false pretenses and false representation" language of

derlying this exception is the principle that bankruptcy is designed to provide a fresh start for honest debtors who unexpectedly fall into financial difficulty. *See Local Loan Co. v. Hunt,* 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934); *Williams v. United States Fidelity & Guaranty Co.,* 236 U.S. 549, 554–55, 35 S.Ct. 289, 290, 59 L.Ed. 713 (1915). By rendering fraudulently obtained debts nondischargeable, the bankruptcy laws implicitly attempt to discourage abuse of bankruptcy proceedings by those whom the laws were not intended to protect.

The issue raised by this appeal involves the scope of conduct which will render a debt nondischargeable under this exception. More specifically, the issue is whether Mrs. Roddenberry's purchases and cash advances were obtained by false pretenses or false representations within the meaning of the statute. According to the bankruptcy court, the decision of *Davison-Paxon* mandates a discharge of the Roddenberrys' credit card debts even if Mrs. Roddenberry had no intention of paying for the goods she purchased. However, the scope of *Davison-Paxon*'s application must be viewed in light of its factual context.

The course of events leading to *Davison-Paxon* began when a creditor, Davison-Paxon Company, filed a state court action for payment of merchandise purchased by Lizabeth Caldwell. Caldwell subsequently filed a bankruptcy petition and received a general discharge. Accordingly, the creditor amended its state court suit to allege that Caldwell had obtained the merchandise by means of a fraudulent concealment of her insolvency. Caldwell responded by seeking to enjoin the state court action on grounds that the debts had been discharged through bankruptcy proceedings. The district court agreed that the debts had been discharged, and the court of appeals affirmed. 115 F.2d at 189–191. In so ruling, the court of

appeals concluded that section 17a(2) "does not except from discharge, debts created by obtaining credit through concealment of insolvency and present inability to pay." *Id.* at 191.

*Davison-Paxon* has been subject to severe criticism because it is understood to reward a debtor's fraudulent concealment of insolvency.[4] A closer examination of the decision, however, reveals that by discharging Caldwell's debts, the court did not intend to reward deceitful non-disclosure. Instead, it sought to deny a particularly improvident creditor the special privilege of an exemption from a general discharge. Although the court acknowledged that Caldwell "did not act in a straight-forward and honest way in not making full disclosure of her financial condition . . . ," it went on to stress that the Bankruptcy Act was remedial statute for the benefit of debtors and that exemptions to discharge therefore should be construed narrowly. 115 F.2d at 191.

The practical wisdom of the court's refusal to extend the special protection of a section 17a(2) exemption to Davison-Paxon Company is evident upon examination of the circumstances surrounding the debt. These circumstances are detailed in the district court's opinion, *In re Caldwell,* 33 F.Supp. 631 (N.D.Ga.1940). Initially, the district court noted that the liabilities which the creditor sought to have exempted from discharge were accumulated over a three year period. Moreover, it was only after Caldwell's application for bankruptcy that Davison-Paxon Company "suddenly discovered that Bankrupt 'purchased merchandise listed on the itemized statement' when she was 'insolvent and had no present intention to pay for the same,' in spite of the fact that the account had been running under the eyes of an expert credit man for a period of two years and eleven months

---

section 17a was intended to eliminate the distinction between overt and implied misrepresentation drawn in *Davison-Paxon.* Zaretsky, *The Fraud Exception to Discharge Under the New Bankruptcy Code,* 53 Am.Bankr.L.J. 253, 257 (1979). At this time, we express no opin-

ion with respect to this construction of section 523(a)(2)(A).

4. *E.g.,* Case Comment, 39 Mich.L.Rev. 812 (1941); Case Comment, 54 Harv.L.Rev. 873 (1941). *See generally* 3 *Collier on Bankruptcy* ¶ 523.08[4] at n. 20 (15th ed. 1982).

without this fact having been discovered . . . ." 33 F.Supp. at 633. After listing the table of credits and debits in Caldwell's account, the district court observed in its finding of facts,

> Nothing unusual appears from this account, which shows the amount of purchases and the credits thereon arising out of return of merchandise and cash payments. It certainly does not disclose the existence of false representations or the use of false pretenses, but on the other hand, shows a pretty even distribution of charges, credits and payments throughout the period, although the unpaid balance of each month added to that of the preceding month gradually increased the indebtedness until it reached the amount sued for. The account indicates an unwise extension of credit rather than fraud on the part of the purchaser. The statement, from which the above tabulation was made, showed innumerable items purchased over a period of three years, and it is inconceivable that she obtained all of them by false pretenses or false representations, and thereby deceived Respondent to its injury.

*Id.* at 634.

In evaluating the factual context of *Davison-Paxon,* it also is important to recognize the nature of the relationship between the debtor and the creditor. Caldwell purchased merchandise directly from her creditor. The relationship was "one on one" and occurred within a controlled environment in which the creditor knew what was purchased, when it was purchased and where it was purchased. This is very different from credit arrangement involving bank credit where a third party creditor has far less control over the use of its cards. This distinction is illustrated in the present case by the bank's inability to recover the credit cards in the Roddenberrys' possession. Recovery was impeded not only by Mrs. Roddenberry's attempts to avoid detection, but also by the bank's inability to determine where she would use the cards next.

The nature of the debtor-creditor relationship also relates to the significance of the concealment. When Caldwell purchased merchandise she was presenting herself to the creditor with whom she had direct and continuous dealings. With each transaction, the creditor had both the opportunity and the incentive to take some precaution in assuring her creditworthiness. Conversely, when Mrs. Roddenberry purchased merchandise she did not present herself to her creditor, and arguably took affirmative steps to avoid such a confrontation. Moreover, the merchants with whom she had direct contact had no incentive to perform a credit check because they were assured payment from the bank so long as the charge was less than $50.00. Indeed, to have performed a credit check would have resulted in a lost sale. The concept of intentional concealment, therefore, loses its significance when third parties provide credit services.

Since *Davison-Paxon* was decided in 1940, the nature of certain credit transactions, and the relationship between debtors and creditors, have changed dramatically. Yet, although the Fifth Circuit has attempted to limit the impact of *Davison-Paxon,* the decision never has been expressly overruled. For example, in *Sears, Roebuck & Co. v. Boydston,* 520 F.2d 1098 (5th Cir.1975), the court reluctantly affirmed a referee's finding of fact that a bankrupt did not intend to conceal his insolvency. The court noted that *Davison-Paxon* apparently mandated discharge even if the bankrupt did not intend to pay for the goods, but did not address the issue. Nevertheless, the court commented that "[t]he rationale underlying *Davison-Paxon* has been seriously eroded in the modern world of credit transactions and the decision has been the subject of much criticism." 520 F.2d at 1101 (citations omitted). Again in *Sears, Roebuck & Co. v. Wood,* 571 F.2d 284 (5th Cir.1978), the issue of *Davison-Paxon*'s continued validity was skirted by the conclusion that no evidence demonstrated an intentional concealment of insolvency on the part of the bankrupt. *Id.* at 285. In both *Boydston* and *Wood,* the court paid lip service to *Davison-Paxon* while actually focusing on the intent of the debtor and examining the facts for evidence

of fraudulent concealment. This type of treatment of *Davison-Paxon* has led a number of bankruptcy courts within the circuit to conclude that *Davison-Paxon* no longer is good law.[5]

Notwithstanding its critics, *Davison-Paxon* retains its validity under limited circumstances—when the credit transactions involve a one-on-one relationship between debtor and creditor of the type common in 1940. When the third party creditors are involved, more analysis is necessary. This analysis, however, must be guided by the principles underlying *Davison-Paxon* that discharge exceptions are to be narrowly construed and that improvident creditors are not to be afforded special protections in bankruptcy for the assumption of common business risks.

### III.

The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. *In re Talbot,* 16 B.R. 50, 52 (Bkrtcy.M.D.La.1981). Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

Bearing in mind these considerations, we hold that the voluntary assumption of risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further *possession and use* of the card, and until the cardholder is aware of this revocation. A card issuer, acting upon its own judgment, may elect to continue to extend credit; it shall be presumed to do so until clear revocation has taken place. Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17a(2)'s exemption from discharge. Purchases made with knowledge that one is not entitled to either use or possession constitute the type of deception intended to be exempted from discharge. It is more than an intentional concealment of insolvency; it is an affirmative misrepresentation that one is entitled to possess and use the card.

The Roddenberrys, however, maintain that the application of *Davison-Paxon* is irrelevant because the bank did not rely upon any fraudulent misrepresentations implied or otherwise. Because the Roddenberrys' account was constantly above its established credit limit, the bankruptcy court agreed that the bank did not rely upon any implied misrepresentation not to pay. Although not incorrect, this finding is relevant only as it pertains to the time prior to the bank's unconditional revocation of the Roddenberrys' possession and use of the card. Debts arising prior to the communication of revocation are part of the risk assumed by the bank. During this period,

---

**5.** *E.g., In re Quintana,* 4 B.R. 508, 510 (Bkrtcy. S.D.Fla.1980); *see, e.g., In re Vegh,* 14 B.R. 345 (Bkrtcy.S.D.Fla.1981); *In re Pitts,* 10 B.R. 557 (Bkrtcy.M.D.Fla.1981); *In re Banasiak,* 8 B.R. 171 (Bkrtcy.M.D.Fla.1981). Each of these cases was decided under 11 U.S.C. § 523(a)(2)(A).

the bank risked non-payment by authorizing conditional possession of the cards. This risk was assumed despite the Roddenberrys' apparent inability to pay, and the credit they obtained during this period was implicitly authorized by the bank. However, once the unequivocal revocation of credit privileges was communicated, the bank no longer agreed to assume this risk. Beyond the point of revocation, Mrs. Roddenberry was not merely concealing an inability to pay, but rather was affirmatively defrauding the bank with whom she no longer had any type of relationship.

Unfortunately, the bankruptcy court's findings of fact were developed from a *Davison-Paxon* perspective, and as a result crucial findings inadvertently were omitted. It therefore is necessary to remand this case for a determination of whether the bank unconditionally revoked the Roddenberrys' right to all use and possession of the cards and if so when that revocation was communicated to Mrs. Roddenberry.

REVERSED and REMANDED.