In re Walter Thomas WILSON, Debtor.

FIRST TENNESSEE BANK, Plaintiff,

v.

Walter Thomas WILSON, Defendant.

Bankruptcy No. 3–82–01438.
Adv. No. 3–82–1116.

United States Bankruptcy Court,
E.D. Tennessee.

Aug. 3, 1983.

George W. McRee, Leonard & McRee, Bristol, Tenn., for plaintiff.

David W. Tipton, Watson, Tipton & Jones, Bristol, Tenn., for defendant.

---

## MEMORANDUM

CLIVE W. BARE, Bankruptcy Judge.

In September 1981, through a "mass mailing," the First Tennessee Bank mailed out VISA First Banking Cards to all of its customers who had (1) maintained a checking account with the Bank for a period of nine months, (2) never been overdrawn, and (3) maintained an average balance of $300.00 in their account. The result of such mailing in this case is an unmitigated catastrophe for the Bank, which seeks judgment against the debtor in the amount of $8,598.36 and a determination of nondischargeability. 11 U.S.C.A. § 523(a)(2)(A) (1979).

Walter Thomas Wilson, the debtor, and his family moved to Bristol, Tennessee, from Ravenna, Ohio, in June of 1980. He and his wife opened a joint account for checking and savings at the First Tennessee Bank (Bank). In September 1981, they received two banking cards, both in the debtor's name, through the mail which they had not requested. In July 1982, the Bank issued renewal cards to replace the original, unsolicited cards.[1]

According to the Bank, the card is not a "credit card" but a "checking account in a card." See Coll.Ex. 1. When the customer uses the Visa First Banking Card to make a purchase, the sales memo is first sent to the merchant's bank and then to First Tennessee Bank, whereupon the customer's account is debited.[2] The Bank guarantees payment to the merchant honoring its customer's banking card of all purchases in an amount of $50.00 or less. Consequently, a prudent merchant could be expected to attempt to verify that his buyer can afford purchases for amounts in excess of $50.00, assuming the merchant did not know the purchaser.

It is undisputed that between May 30th and July 26th of 1982, the debtor made 227 purchases totaling $7,399.86. Merchandise purchased varied in cost from $3.64 to $54.40 and included gas, clothing, food, small household appliances (fan, radio), and a wide variety of other articles, many of which were nonnecessities. Six of these purchases, each exceeding fifty dollars, totaling $309.12 have been charged back to various merchants by the Bank. However, based on its guarantee, the Bank incurred liability on the debtor's remaining 221 purchases.

Prior to and through June 1982 the debtor's checking account with the Bank did not reflect any overdrafts. However, on July 6, 1982, his account reflected a negative balance of $5.85. According to Hope Byrd, an assistant Bank cashier, when an overdraft occurs, a notice is sent to the customer to "cure the overdraft" within six days. If the overdraft is not cured, a second notice is sent on the tenth day. On the fifteenth day the card is "locked in the computer." Ms. Byrd testified this procedure was followed in the debtor's case, the last notice being mailed on July 21, 1982. Additionally, Ms. Byrd phoned the debtor's home on or after July 13, 1982, because she noticed the negative balance in the debtor's account had increased to an amount in excess of $300.00. Although she spoke with the debtor's son, her calls were not returned by the debtor. On July 26, 1982, two officials of the Bank visited the home of the debtor; whereupon, he surrendered the Visa First Banking Cards upon their request.

According to the debtor's testimony, his wife is responsible for payment of their bills. The debtor testified that his wife was in North Carolina during most of July and that he simply "piled the mail" during her absence. Yet, he admitted that he received one or more of the overdraft notices from

---

1. The cards issued in September 1981 had an expiration date of July 1982.

2. The cardholder agreement recites in part:
   *Authorization.*
   Use of the card to purchase goods or services or to obtain cash at a financial institution shall be considered a simultaneous withdrawal from your checking account even though the withdrawal may not actually be posted to the account until a later date. You authorize us to charge to your checking account all withdrawals originated by authorized use of the card.

the Bank. Debtor further testified that he misunderstood the Bank's notice(s); he believed the purpose of the notice(s) was to inform him he had money in the Bank.

On August 9, 1982, the debtor contacted an attorney and discussed filing a bankruptcy petition.[3] Thereafter, during the latter part of August 1982, two police officers visited the debtor at his home to discuss his use of the banking card. They did not, however, take a statement from the debtor during this visit. Some two weeks later the officers returned to again discuss the matter, but the debtor was not at his home. On October 5, 1982, after learning that the police had returned to his home, the debtor went to the local police station where Capt. Eddie Wampler wrote out a statement which the debtor signed. This statement recites in part:

I decided as a result of my debts and not being able to meet my obligations that I would use the card and buy the things my family needed. I knew that I would later file a bankruptcy on the debts.

At trial the debtor testified that Capt. Wampler did not record his statement word for word. According to the debtor this recorded statement is misleading because it is not in context. He further testified that he requested that his statement be rewritten, but he was told there was not time for that to be done.

On September 27, 1982, previous to the date of giving his statement to the police, the debtor filed his chapter 7 bankruptcy petition. He scheduled $2,446.96 in secured debts and some $21,849.68 in unsecured debts, including an $8,461.18 debt to First Tennessee Bank for banking card purchase charges. Assets included household goods, wearing apparel, jewelry, firearms, and two vehicles (a 1973 Buick and a 1976 Datsun pickup truck), with a total value of $7,795.00. Exemptions have been claimed for all of the debtor's property with the exception of his pickup truck, which is encumbered by a lien. See Tenn.Code Ann. §§ 26–2–102 and –103 (1980).

The debtor is 44 years of age, married and has two teenage children, ages 16 and 18, in high school. He has been disabled for many years; he presently receives disability income (Social Security and Veterans Administration) of approximately $550.00 per month. Although he testified that he is a high school dropout, the debtor also testified that he holds an LLB degree and two associate degrees from a college in Ohio. His last employment was in 1970 when he worked as a machinist. He lost that job when he was sent home because he was "emotionally upset."

The Bank alleges that the debtor committed actual fraud by using the banking card concomitantly knowing that he did not have sufficient funds in his account with which to pay for the goods purchased and in contemplation of, and with the intent to discharge the debt in, bankruptcy. The debtor denies that he is guilty of any fraud. He asserts that due to his confused mental state the necessary element of actual fraud is lacking. 11 U.S.C.A. § 523(a)(2)(A) (1979).

In *First National Bank v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), the court noted:

"This appeal raises the important and timely issue of when liabilities resulting from abuse of bank credit cards are exempt from general discharge through bankruptcy proceedings."[4] *Id.* at 927.

The *Roddenberry* court first discussed at some length the holding in *Davison-Paxon Co. v. Caldwell,* 115 F.2d 189 (5th Cir.1940), *cert. denied,* 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941), wherein a divided panel

**3.** The debtor had previously filed a chapter 7 bankruptcy petition in October 1965 in Akron, Ohio. He received a discharge in that case in January 1966.

**4.** Although this case was decided under § 17(a) of the former Bankruptcy Act, § 523(a)(2)(A) of the Bankruptcy Code, under which the present action is brought, is modified only slightly from former § 17(a)(2). "Actual fraud" is added as a ground for exception from discharge. The word "services" is added. Also, false financial statements are dealt with separately in § 523(a)(2)(B).

of the former Fifth Circuit concluded that the purchase of goods on credit, with an intentional concealment of insolvency at the time of purchase, was not excepted from discharge.[5] Upon reviewing the scope of *Davison-Paxon,* the court concluded that the rule enunciated in the decision does not warrant "mechanical application." Instead, modern credit transactions necessitate a case-by-case examination to determine if the challenged liability is within the scope of obligations anticipated to be discharged in *Davison-Paxon.* The court then concluded: "[I]n transactions involving bank credit cards the analysis must involve a determination of whether the bank unconditionally revoked the cardholder's right to use and possession of that card and if so when the cardholder became aware of such revocation." *Roddenberry,* 701 F.2d at 928.

The *Roddenberry* opinion recites some pertinent observations about the element of risk in the issuance of bank credit cards:

The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits

because of the high finance charges typical in such transactions. *In re Talbot,* 16 B.R. 50, 52 (Bkrtcy.M.D.La.1981). Banks are willing to risk non-payment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

*Roddenberry,* 701 F.2d at 932.

Mindful of these considerations, the court held:

[T]he voluntary assumption of risk on the part of a bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further *possession and use* of the card, and until the cardholder is aware of this revocation. A card issuer ... may elect to continue to extend credit; it shall be presumed to do so until clear revocation has taken place. Only after such clear revocation has been communicated to the cardholder will further use of the card result in liabilities obtained by "false pretenses or false representations" within the meaning of section 17(a)(2)'s exemption from discharge.

*Roddenberry,* 701 F.2d 932.

The debtor herein asserts that the facts presented in *Roddenberry* are strikingly similar to those in the present case except that the Roddenberrys had applied for the banking cards which they utilized, whereas he had not. The debtor insists that under the holding in *Roddenberry* the Bank's debt should not be excepted from his discharge. In contradistinction, the Bank maintains the decision in *Roddenberry* should not be followed because it is "too expansive." Plaintiff's Brief at 6. The Bank also contends that the present case is factually distinguishable from *Roddenberry.*[6]

---

**5.** The court noted that *Davison-Paxon* had been the subject of severe criticism because it was understood to reward a debtor's fraudulent concealment of insolvency. "A closer examination of the decision, however, reveals that by discharging Caldwell's debts, the court did not intend to reward a deceitful non-disclosure. Instead, it sought to deny a particularly im-

provident creditor the special privilege of an exemption from a general discharge." *Roddenberry,* 701 F.2d at 930.

**6.** The Bank cites the following distinctions:

(1) Its Visa First Banking card is dissimilar from the Bank Americard involved in *Rod-*

Although this court concurs in the observations in *Roddenberry* concerning the inherent risk assumed by the issuers of bank credit cards and the considerations which apparently make the risk worthwhile, the court is not bound by the holding in *Roddenberry*.

Bankruptcy Code § 523(a) recites in material part:

A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt—

.    .    .    .    .

(2) for obtaining money, property, [or] services . . . by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition . . .

. . . .

Although the language of its holding is unequivocal, the *Roddenberry* court did note: "Debts incurred prior to unconditional revocation *may* be dischargeable." (Emphasis added.) *Roddenberry*, 701 F.2d at 928. If the *Roddenberry* holding provides that banking card purchases previous to receipt of notification of revocation of authorized use are dischargeable per se, without regard to actual fruadulent intent on the part of the card user, the holding may go too far. Code § 523(a)(2)(A) is unambiguous: Debts for obtaining property or services through actual fraud or false representations (other than through the use of a false financial statement)[7] are nondischargeable.

Use of the banking card by the debtor involved representations that he was both authorized to use the card and that he intended to pay for his purchases. See *Strawbridge & Clothier v. Caivarelli*, 16 B.R. 369 (Bkrtcy.E.D.Pa.1982). The banking card was the functional equivalent of a check written against the debtor's account with the Bank. The debtor had some degree of appreciation of this fact. According to his own testimony there were occasions he used the banking card realizing a deduction would be made against his checking account. On other occasions, however, he thought he was using a credit card. Significantly, the debtor admitted at trial that he realized, at various times, that he was purchasing items with the banking card for which he did not have the means to pay. He also testified that there were other times when he did not appreciate his inability to pay for the items he purchased with the banking card.

Although the purchases resulting in overdrafts commenced five weeks previous to the debtor's consultation with his attorney during which bankruptcy was discussed, the debtor had previously received a discharge in bankruptcy from an Ohio court in 1966. Consequently, he presumably has some understanding relative to the concept of a discharge of debts in bankruptcy.

The debtor's bankruptcy schedules, filed on September 27, 1982, clearly reflect his insolvency. His prepetition liabilities exceed his assets by the amount of $16,501.64. Although he and his family have a fixed, limited income, the debtor nevertheless made some 227 purchases through the use of the banking card in less than two months. Numerous purchases were for nonnecessities, including but not limited to:

*denberry* since the First Banking card is not really a "credit" card.

(2) The debtor in the instant case had held and satisfactorily used the First Banking card for nearly one year.

(3) The purchases in the present case occurred within a relatively short period of time, approximately two months, whereas the challenged debts incurred in *Roddenberry* spanned a period of nearly one year.

The court agrees with the third distinction cited by the Bank but disagrees with the second—the opinion in *Roddenberry* suggests the debtors' use of their Bank Americard was satisfactory for two years or longer. It is unnecessary for the court to determine whether material distinctions exist between the debtor's banking card at issue herein and a Bank Americard.

7. Exception from discharge on the basis of a false financial statement is provided for in 11 U.S.C.A. § 523(a)(2)(B) (1979).

| Item | Total Amount |
| --- | --- |
| Ammunition | $ 306.12 |
| Cheese | 500.34 |
| Flowers | 36.32 |
| Gun holster | 40.03 |
| Records | 98.03 |
| Sporting goods | 81.44 |
| Wine glasses | 47.51 |

A credit purchase of goods by a debtor without the intention to pay for the goods is fraudulent. See 3 Collier on Bankruptcy ¶ 523.08[4] (15th ed. 1982). A conclusion that the debtor defrauded the Bank through his use of the banking card is inescapable based on the evidence, including the debtor's admission he realized at times he was purchasing items for which he could not pay.[8]

This Memorandum constitutes findings of fact and conclusions of law, pursuant to Bankruptcy Rule 752.

---

**8.** The Bank conceded at trial that even though it succeeds in obtaining a nondischargeable judgment, in all probability it will result in only a Pyrrhic victory, since all assets and income of the debtor are exempt from execution or garnishment under applicable Tennessee statutes.