**In the Matter of Diana E. ROBINSON, Debtor.**

**The FIRST NATIONAL BANK OF ATLANTA, Plaintiff,**

v.

**Diana E. ROBINSON, Defendant.**

**Bankruptcy No. 84–01240–TH. Adv. No. 84–0178.**

United States Bankruptcy Court, S.D. Indiana, Terre Haute Division.

Nov. 27, 1985.

M. Sidney Glanzman, Goldstein, Glanzman, Brown & Katzman, Indianapolis, Ind., for First Nat. Bank of Atlanta.

Kimberly Antcliff Jackson, Riley, Ind., for Diana E. Robinson.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MICHAEL H. KEARNS, Bankruptcy Judge.

This cause came on for trial on February 22, 1985 on a Complaint to Determine Dischargeability of a Debt filed by plaintiff, The First National Bank of Atlanta, (hereinafter referred to as the "Bank"), on November 1, 1984. The Bank appeared by M. Sidney Glanzman; debtor, Diana E. Robinson, appeared by counsel, Kimberly A. Jackson. Witnesses were sworn, evidence was heard whereafter the parties rested. The Court, having heard the evidence and arguments of counsel, personally observed the demeanor of the witnesses, and having adjudged their credibility and weighed the evidence presented, now adopts the following Findings of Facts and Conclusions of law:

The defendant/debtor in the within case, Diana E. Robinson, (the "debtor"), is single and appeared to be in her middle thirties.

At the time of trial, she lived in an apartment in the City of Terre Haute, Indiana and was employed as a department secretary at Indiana State University where she had worked continuously for the last sixteen (16) years.

She testified that her annual salary was currently Eight Thousand Eight Hundred ($8,800.00) Dollars, that she had a take-home pay of Two Hundred Twenty-seven ($227.00) Dollars every two (2) weeks, and that her apartment rental cost was Two Hundred ($200.00) Dollars a month.

Judicial notice of her Statement of Affairs reveals that she had filed Bankruptcy on one previous occasion; that being in this Court during the calendar year 1973. Her Statement of Affairs failed to state any further information as to whether or not she received a discharge. The Court's records indicate, however, that the debtor herein received a Discharge in Bankruptcy in this Court on December 15, 1972.

Further, judicial notice of the schedule of debts in the instant case shows that at the time of the filing of the Bankruptcy Petition under Chapter 7 of Title 11 of the United States Code, on August 6, 1984, the debtor had a total debt load of Twenty-three Thousand Nine Hundred Seventy-five ($23,975.00) Dollars. Her secured debts consisted of two (2) obligations, one with Associates Financial Services in the amount of Three Thousand Two Hundred ($3,200.00) Dollars, and the other with Heights Finance totaling One Thousand Six Hundred Fifty ($1,650.00) Dollars. Both of these debts were secured by household goods and were incurred in the calendar years 1981 and 1982 respectively. No evidence was presented as to whether or not the liens were avoidable pursuant to 11 U.S.C. 522(f).

The debtor's unsecured scheduled debts, in addition to the indebtedness owed to the Bank, the dischargeability of which debt is here at issue, lists an obligation to the Indiana State Federal Credit Union in the amount of One Thousand Two Hundred ($1,200.00) Dollars. Among the other listed unsecured debts are three (3) credit card indebtednesses which are in the following particulars:

| Name of Creditor | Date Debt Incurred | Amount of Debt |
| --- | --- | --- |
| Bank One Columbus, Ohio | 1983 | $4,400.00 |
| First Card Elgin, Illinois | 1983 | $3,300.00 |
| Visa Columbus, Ohio | 1983 | $1,600.00 |

The approximate total indebtedness of these three (3) cards is Nine Thousand Three Hundred ($9,300.00) Dollars, or over forty-eight percent (48%) of her overall debt load of Nineteen Thousand One Hundred Twenty-five Dollars ($19,125.00).

The facts elicited at trial show that the debtor was not current in her payments upon at least two (2) of these three (3) existing credit card accounts.

The debtor testified that she knew she could not make full payment on these credit card accounts, and further that the First Bank of Elgin, Illinois had previously asked for the return of their card as the debtor had exceeded her credit limit on this account. Debtor further testified, however, that she had sent the Elgin card back and was making "regular payments", but didn't remember the amount of payments. She also testified she knew she was behind with Bank One of Columbus and that her income alone was insufficient to pay "these" accounts, and that she was behind on her payments on most of her bills listed in her schedules.

The debtor had a sister, also single, who testified on her behalf. The sister, Deborah Robinson, was approximately thirty-five (35) years of age, and also lived in the City of Terre Haute, Indiana in a house which she had purchased for Four Thousand ($4,000.00) Dollars. The sister stated this house had no liens, and in her opinion, had a fair market value of ten to twelve thousand ($10,000–$12,000) Dollars.

The debtor also stated at the trial that she had an agreement with her sister to personally provide money and physical labor to help fix up her sister's house for sale, and that when such sale was accom-

plished, which she approximated would be from four (4) to six (6) months from April of 1984, she and her sister would split the profit. It is to be noted the debtor stated that she had loaned some money to her sister, Deborah Robinson, which loans remain unpaid and the amounts of which were not disclosed. According to debtor's testimony, it was the anticipated profit from the sale of the house that the debtor was relying upon for the repayment of her sister's debt to her, and also the source from which debtor would be able to reduce her overall debt load.

On or about March, 1984 the debtor received in the mail what was labeled "Exhibit B" herein set out. This document speaks for itself.

Your account has already been approved!

☒ Yes, please send me a new First Atlanta VISA card with a $2000 credit line.

G5667844    101

285 093 277

DIANA E ROBINSON
901 OAK
TERRE HAUTE IN 47803

03-IN    101

Offer expires:  APRIL 30, 1984

FIRSTATLANTA

If you prefer to request your new VISA card by phone dial
1-800-241-6692 and ask for Ext. 2

Testimony by the debtor revealed that she received Exhibit B on or about March, 1984.

Exhibit B is an "offer" to request a Visa card with a pre-approved credit line of Two Thousand ($2,000.00) Dollars with the Bank. This document was properly addressed to the debtor (although the zip code thereon was incorrect), and states that debtor's account has already been approved. A reasonable reading of it implied that by either marking the "yes box" or calling the toll free number, plus providing only the name of her employer, her position, her business and home phone numbers, and her social security number she would receive the credit card. This document also indicates that all debtor need do was to date the form, sign it and return it if she chose this option over the phone response. One final feature of the "offer" is that it expired on April 30, 1984, which, by the evidence, leads to the conclusion that this "offer" was available to the debtor for a period not in excess of sixty (60) days.

The debtor did, in fact, fill out the "offer" on the date indicated, sent it in, and obtained The First Atlanta card on or about April 20, 1984.

At trial, a stipulated Exhibit was introduced into evidence. This stipulated Exhibit consisted of eleven (11) pages which was a compilation of the Bank's in-house records of debtor's transactions, including cash advances and purchases made, finance charges assessed, and payments made. This Exhibit and its entries are not only uncontroverted but the parties stipulated as to its accuracy.

A reading of this stipulated Exhibit shows that between April 24, 1984 and June 22, 1984, a period of less than sixty (60) days, the debtor made approximately one hundred twenty-four (124) different charges to her account, of which at least ten (10) of these purchases were made on May 30, May 31, and June 1, 1984 at K–Mart, with each purchase being less than the Fifty Dollars ($50.00). It was customary for merchants to screen cardholders making purchases in excess of Fifty Dollars ($50.00). This one particular series of transactions, although admittedly the most exascerbated example, closely represents debtor's use of this credit card while it was in her possession. This particular series of transactions is herein set out and reads as follows:

A further examination of the bulk exhibit discloses that on May 27, 1984, the debtor purchased goods from the Furrow Building Material store in Terre Haute, on three (3) separate occasions, again each purchase being under the Fifty Dollar ($50.00) amount. Further testimony revealed on June 5, 1984 the debtor again made five (5) separate purchases from the Furrow Building Materials store in Terre Haute, again each purchase being under Fifty Dollars ($50.00).

In addition to using the card to pay off other indebtednesses, the evidence shows that the types of goods debtor purchased with the Bank Atlanta card included house-

hold items, personal clothing, automotive goods, Christmas and party items, and entertainment such as dining out. Debtor offered proof that of the purchases made, Two Thousand Two Hundred Thirty-eight Dollars and Ten Cents ($2,238.10) was spent to purchase home improvement items for her sister's house.

In June, 1984, the debtor received a call from a representative of the Bank advising her she had exceeded her Two Thousand ($2,000.00) Dollar credit line and requested she send the card back. The debtor did so on or about the 14th day of June, 1984. The balance due on the debtor's account on June 21, 1984 was approximately Five Thousand One Hundred Sixty-eight Dollars and Twenty-five Cents ($5,168.25). When the debtor filed her Petition in Bankruptcy under Chapter 7 on August 6, 1984, the total indebtedness owed to the Bank was Five Thousand Six Hundred Eighty-nine Dollars and thirty-six Cents ($5,689.36).

The Bank contends the debtor obtained the extension of credit through fraud, under 11 U.S.C. 523(a)(2) and concludes the entire amount of the indebtedness owed to it is nondischargeable. In support thereof, the Bank alleges:

(1) That debtor induced store clerks and merchants to divide large purchases into constituent items each under the Fifty Dollar ($50.00) level so that each transaction could be concluded without telephone authorization from the Bank;

(2) That debtor made a number of separate purchases, many on the same day and many times with the same merchant, each time purchasing items with a retail price that would avoid the retailer from seeking telephone authorization for such charge; and

(3) That prior to the time debtor made such purchases with Bank's credit card, debtor's economic situation was such that she knew, or should have known, she would have insufficient income to repay the amounts charged.

The Bank concludes that these acts of debtor constitute a conscious effort on her part to defraud the Bank by pursuit of a scheme that could have effectively prevented the Bank from halting the use of her credit card within or without the limits established by the credit card agreement.

Although the Bank, in its Complaint, asserts that debtor's debt is nondischargeable, and specifically relies on 11 U.S.C. 523(a)(2), specificity is lacking in this Complaint as to whether or not counsel is relying on Section 523(a)(2)(A) or 523(a)(2)(B). This failure to clearly and specifically set out the ground or grounds upon which the claim is brought is not fatal however. The dischargeability of a claim is not to be determined by the form of Complaint, but resort may be had to the entire record to ascertain whether it falls within the exception. *Greenfield v. Tuccillo*, 129 F.2d 854 (2d Cir.1942). Further, the form of the Bank's Complaint, together with the proof presented at trial are such that the pleadings are deemed amended to conform to the issues which were tried without objection, *In re Vines*, 430 F.Supp. 465 (ND ALA.1977), *affm'd, Vines v. Bank of Lexington*, 560 F.2d 1022 (5th Cir.1977). Although Section 523 of Title 11 of the United States Code enumerates several grounds of nondischargeability, this Court concludes that the Bank relied on 11 U.S.C. Section 523(a)(2)(A).

The debtor generally denied that she possessed a requisite intent to commit fraud; she intended to pay her debts at the time she incurred the same, and she was relying heavily upon the anticipated profit from the sale of her sister's house as a source for such repayment.

The sweeping relief under the automatic stay of 11 U.S.C. Section 362 and the discharge provision of 11 U.S.C. 524 of the Bankruptcy Code are balanced by Section 523 which lists certain types of debts to be nondischargeable. Specifically, Section 523(a)(2)(A) provides:

(a) A discharge under Section 727, 1141, or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

To prevent the discharge of debts incurred on a credit card account under this Section, a plaintiff must prove:

(1) the debtor made a materially false representation;

(2) the debtor had intent to deceive; and

(3) the creditor relied on the false representation. *In re Ciavarelli*, 16 B.R. 369, (Bkrtcy.E.D.Pa.1982).

Merely exceeding the credit limit is insufficient proof, in and of itself, that the debtor did not intend to pay the debt incurred on the credit card. *See, In re Davis* 42 B.R. 611 (Bkrtcy.E.D.VA.1984). Nevertheless, a credit card holder's use of a credit card is an implied representation to the issuer that the holder has both the ability and intention to pay for purchases charged. *In re Lipsey*, 41 B.R. 255, (Bkrtcy.E.D.PA. 1984); *In re Pittman*, 41 B.R. 382 (Bkrtcy. W.D.MO.1984); *In re Barnacle*, 44 B.R. 50, (Bkrtcy.MN.1984); *Davis*, supra, 42 B.R. at 614.

■ Other factors to be considered in determining whether the debtor intended to deceive within the meaning of Section 523(a)(2)(A) include; (1) the length of time between the charges made and the filing of the Bankruptcy Petition; (2) whether or not an attorney has been consulted concerning the filing of the Bankruptcy Petition before the charges were made; (3) the number of charges made; (4) the amount of the charges; (5) the financial condition of the debtor at the time the charges were made; and (6) whether the charges were beyond the credit limit of the account. *See, Matter of Stewart*, 7 B.R. 551 (Bkrtcy.M.D.GA. 1980); *In re Petrini*, 23 B.R. 981, (Bkrtcy. E.D.PA.1982); *In re Ciavarelli*, supra.

■ Finally, a creditor seeking nondischargeability of a debt under Section 523(a)(2)(A) must establish he reasonably relied to his detriment on a debtor's misrepresentation of ability to pay. *Matter of Esposito*, 44 B.R. 817 (Bkrtcy.S.D.N.Y. 1984); *In re Mutschler*, 45 B.R. 482 (Bkrtcy.D.ND.1984); *In re Long*, 44 B.R. 300 (Bkrtcy.D.MN.1983). The reasonableness of a creditor's reliance must be viewed in light of a debtor's prior card use and actions which the creditor/issuer takes upon discovery of charges it claims to be nondischargeable. *In re Bono,* 41 B.R. 629, (Bkrtcy.D.MASS.1984).

■ The facts here show the debtor was not current in payment on at least two (2) of the three (3) existing credit card accounts at the time she applied for the credit card issued by the bank. One of these three issuers had requested the debtor to send back the credit card it issued to her as she had exceeded the card's limits. Furthermore, the debtor at this time was earning take-home pay of approximately Two Hundred Twenty-seven Dollars ($227.00) every two (2) weeks and testified she knew she could not make full payment on these credit card accounts from her income alone. Although the evidence indicates the debtor at times had help paying some of her bills, she was primarily responsible for all of her debts.

Most of the charges the debtor incurred were either for luxury goods or home improvement items she purchased for her sister's house, which house she and her sister were planning to sell and divide the proceeds. Many of the charges were under Fifty Dollars ($50.00) and therefore were not screened as is customary with credit card purchases exceeding this sum. On some occasions, the debtor made purchases, the total of which exceeded Fifty Dollars ($50.00) from a single merchant on a given day, but did so by making separate transactions with the same merchant on the same day, each transaction being under the Fifty Dollar ($50.00) limit, thereby avoiding one (1) large purchase. Finally, the debtor's last credit card purchase was made on or about June 22, 1984. The debtor thereafter filed her Bankruptcy Petition on August 6, 1984. Although the evidence

indicates the debtor did not consult an attorney until after she incurred the charges to her account, the Court concludes the property, services, and money the debtor received through use of the Bank's credit card was obtained by false pretenses under Section 523(a)(2)(A).

Such a finding of false pretenses, however, does not lead this Court to conclude the entire indebtedness of Five Thousand Six Hundred Eighty-nine Dollars and Thirty-six Cents ($5,689.36) incurred by the debtor's use of the credit card is nondischargeable. Equally essential to proving nondischargeability is the issue of whether the Bank relied upon the debtor's representations to pay the debts she incurred.

The Court first notes this case, as in *First National Bank v. Roddenberry*, 701 F.2d 927 (11th Cir.1983), raises the broader issue of "when liabilities resulting from abuses of bank credit cards are exempt from general discharge." *Roddenberry*, supra, at 927. This Court does not announce a rule to be mechanically applied excepting from discharge debts incurred by credit purchase while intentionally concealing insolvency at the time of purchase. The proposition that "modern credit transactions necessitate a case-by-case examination to determine if the challenged liability is within the scope of obligations anticipated to be discharged" is the rule adopted herein. See *Roddenberry*, supra; *In re Wilson*, 32 B.R. 772, (Bkrtcy.E.D.TN.1983). See also *Davidson-Paxon Co. v. Caldwell*, 115 F.2d 189 (5th Cir.1940), *cert. denied*, 313 U.S. 564, 61 S.Ct. 841, 85 L.Ed. 1523 (1941).

As to the issue of reliance, in cases where a debtor submits written information in hopes of initially obtaining credit from a creditor, the debtor's written statement in regard to his financial condition must be a "contributory cause of the extension of credit" if reliance is to be shown. *In re Coughlin*, 27 B.R. 632 (B.R.App., 1st Cir., 1983).[1]

■ A plaintiff seeking nondischargeability of a debt must not only prove he relied upon the representations of the debtor, but also that such reliance was reasonable. *Matter of Newmark*, 20 B.R. 842 (Bkrtcy.E.D.NY.1982). *In re Higgs*, 39 B.R. 181 (Bkrtcy.N.D.OH.1984). Special considerations regarding a determination of reasonable reliance arise where, as here, a creditor extends credit as the result of an *unsolicited* credit card application.

*In First National Bank v. Roddenberry, supra*, the Court held that only the debt which the debtor incurred *after* the creditor *unconditionally revoked* the debtor's right to further possession and use of its credit card was nondischargeable under Section 17(a) of the Bankruptcy Act (forerunner to Section 523(a)(2)(A) of the Bankruptcy Code). It was the opinion of the *Roddenberry* Court that, although a debtor knowingly exceeded his credit limits on a credit card, the issuer thereof voluntarily assumed or perhaps even encouraged this extension of credit over and beyond established credit limits, and therefore should not be allowed to seek refuge in a Bankruptcy Court's determination that such debt is nondischargeable *in toto*.

The Court in *Roddenberry* stated:

The element of risk is inherent in the issuance of bank credit cards. Our "credit-card economy" encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained),

---

1. *In re Coughlin*, 27 B.R. 632 (B.R.App., 1st Cir.1983) dealt with the extension of credit under Section 523(2)(2)(B) which provides:
    A discharge under section 727 .... of this title does not discharge an individual debtor from any debt—
    for obtaining money, property, services, or an extension, renewal, or refinance of credit, by—
    use of a statement in writing—

(i) that is materially false;
(ii) respecting the debtor's or an insider's financial condition;
(iii) on which the creditor to whom the debtor is liable for obtaining such money, property, services, or credit reasonably relied; and
(iv) that the debtor caused to be made or published with intent to deceive.

the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked. It is not the function of courts to determine when a bank ought to revoke credit. It also is of little consequence that the bank can show that the terms and conditions said to apply to use of the card have been violated. The mere breach of credit conditions is of minimum probative value on the issue of fraud because banks often encourage or willingly suffer credit extensions beyond contractual credit limits. Indeed, banks have a definite interest in permitting charges beyond established credit limits because of the high finance charges typical in such transactions. *In re Talbot*, 16 B.R. 50, 52 (Bkrtcy.M.D. LA.1981). Banks are willing to risk nonpayment of debts because that risk is factored into the finance charges. Because the risk is voluntary and calculated, section 17a(2) should not be construed to afford additional protection for those who unwisely permit or encourage debtors to exceed their credit limits.

*Id.* at 932.

Acknowledging that *Roddenberry* was the prevalent standard up to that time, the Court in *In re Wilson, supra,* a case factually similar to the one at bar, took a different approach. In *Wilson,* the First Tennessee Bank ("FTB") mailed Visa first banking cards to its customers who:

(1) maintained a checking account with FTB for a period of nine (9) months;

(2) never had been overdrawn, and

(3) maintained an average balance of Three Hundred Dollars ($300.00) in their account.

This FTB did without prior request by customers for such banking cards. Approximately ten (10) months later, FTB replaced the original unsolicited cards with renewal cards, again in the absence of a customer's request to do so.

In the *Wilson* case, FTB sent an unsolicited banking card to Wilson in September, 1981, and sent a renewal card in July, 1982.

Wilson's account, however, did not reflect any overdrafts until July, 1982. Between May 30, and July 26, 1982, Wilson charged Two Hundred Twenty-seven (227) purchases totaling Seven Thousand Three Hundred Ninety-nine Dollars and Eighty-six Cents ($7,399.86) to the banking card sent to him by FTB. Most of the purchases were for luxury goods such as amunition, cheese, records, flowers, and sporting goods. Furthermore, Wilson failed to open overdraft notices FTB sent him in the mail. Wilson contacted an attorney to discuss filing a Bankruptcy Petition approximately two (2) weeks after FTB demanded him to surrender possession of his banking card. Although unemployed Wilson drew monthly disability benefits totaling approximately Five Hundred Fifty Dollars ($550.00). Finally, he testified he realized at the time the purchases were made he could not pay for them.

The Court had little difficulty in determining the debtor defrauded FTB through his use of the banking card, despite the fact the card had been issued to the debtor unsolicited.

This Court can, on one hand, follow *Roddenberry* and hold nondischargeable only that amount of debt incurred by the debtor *after* the Bank requested the return of debtor's credit card, despite the fact that the debtor by the amount and number of her purchases, demonstrated bad faith in exceeding the credit card's limits. On the other hand, this Court can follow *Wilson* and hold the entire debt owing to the Bank nondischargeable even though the Bank sent to the debtor a credit application she did not request and freely extended credit to her thereafter, without inquiry into her financial circumstances. To adhere to either *Roddenberry* or *Wilson* under the facts here would ignore the equities of the case and therefore, this Court reaches a decision that it deems to be a harmonious midpoint between *Roddenberry* and *Wilson.*

Here, the Bank sent to the debtor an unsolicited, pre-approved application for a credit card with a line of credit pre-ap-

proved in the amount of Two Thousand Dollars ($2,000.00). No evidence exists to suggest the Bank sent this unsolicited application only to "preferred customers" who had demonstrated financial responsibility through previous dealings with the Bank. Had this been the case, the facts here might warrant an outcome similar to that in *Wilson*. Instead, the evidence indicates the Bank's approval of the debtor as a credit card holder was not conditioned upon any inquiry into the debtor's financial condition. There was no inquiry as to the number of debtor's existing credit card accounts or her indebtedness. Rather, the Bank issued the debtor a credit card upon receiving the scant information requested on the application. This the Bank did despite the fact the debtor was delinquent in at least two (2) other credit card accounts. The information so given on the application was not challenged as false.

Regardless of whether the debtor, when filling out the pre-approved application, had an intent not to pay the debts to be incurred by using the card, this Court concludes the initial Two Thousand Dollar ($2,000.00) credit line extended to the debtor is dischargeable, as the bank did not rely upon any misrepresentation of the debtor in granting such extension of credit. By mailing an unsolicited pre-approved application for credit, and thereafter making no inquiry whatsoever as to the applicant's financial condition or ability to pay, the Bank issued the debtor a Two Thousand Dollar ($2,000.00) pre-approved line of credit at its own risk, a risk it presumably was willing to take.

As this opinion is being penned, the Banking, Finance and Urban Affairs Committee of the United States House of Representatives has released public information that presently there are more than seven hundred million (700,000,000) credit cards in the hands of about ninety-one million (91,000,000) Americans who are paying Six Billion Dollars ($6,000,000,000.00) a year in interest These statistics, released in late October of 1985, provide poignant and prophetic validity to the Court's statement in *Roddenberry*, supra, and *Davidson-Pax-*

on, supra, that "banks are willing to risk nonpayment of debts because that risk is scheduled into the finance charges".

This Court further opines that today's proliferation of plastic, left unchecked, will proffer and perpetuate even greater numbers of credit purchases which will in all likelihood be most precipitous. The continuation of such improvident lending practices will lead to greater losses to the consumer credit industry because of nonpayment and/or recourse to the relief afforded by Bankruptcy legislation.

The consumer credit industry is best situate to control these losses by internal structuring and regulation of its credit extension policies.

In this case, the Court concludes that the Bank shall not be allowed to follow imprudent lending practices such as those outlined herein and then seek recourse and rescue from the courts to preserve and protect it from a risk it freely assumed in order to gain greater profits from collection of finance charges. Accordingly, Two Thousand Dollars ($2,000.00) of the total indebtedness to the Bank is dischargeable.

The remaining debt of Three Thousand Six Hundred Eighty-nine Dollars and Thirty-six Cents ($3,689.36), representing the amount which exceeded the initial Two Thousand Dollar ($2,000.00) pre-approved credit line, calls for a different analysis. No evidence existed to show the Bank intended additional credit to the debtor beyond the pre-approved Two Thousand Dollar ($2,000.00) credit limit. Although the Bank issued a pre-approved line of credit at its risk, that risk was only up to the amount of Two Thousand Dollars ($2,000.00). The debtor testified she was aware of the credit limits of the card. Nevertheless, she exceeded the credit limit by a sizeable amount. This she did by charging multiple purchases from the same merchant on the same day. Furthermore, she knew she was primarily responsible for her own debts and knew her financial condition at the time the purchases were made. Finally, the debtor testified she knew she

did not have the means to pay her credit-card bills when she made the purchases. The debtor's knowledge of her financial circumstances at the time she applied for the credit card issued by the Bank, along with the number and type of charges made and the manner in which they were made, leads the Court to an inescapable conclusion the remaining balance of Three Thousand Six Hundred Eighty-nine Dollars and Thirty-six Cents ($3,689.36) is nondischargeable.

### ORDER

The Court, having heard the evidence and weighed the same, as well as observed the witnesses and their demeanor, and giving the weight to which the Court feels the testimony is entitled, and being duly advised in the premises, and having entered its Findings of Fact and Conclusions of Law, now

ORDERS, ADJUDGES AND DECREES that the sum of Two Thousand Dollars ($2,000.00) representing the pre-approved credit line is determined to be a dischargeable debt, but that the amount of Three Thousand Six Hundred Eighty-nine Dollars and Thirty-six Cents ($3,689.36), being the sum in excess of the pre-approved credit line, is determined to be a nondischargeable debt in these Bankruptcy proceedings.

IT IS FURTHER ORDERED that costs of this action, if any, are to be divided equally by and between plaintiff/bank and defendant/debtor.