**In re Theodros GELAGAY, Debtor.**

**SIGNET BANK/VIRGINIA, Plaintiff,**

v.

**Theodros GELAGAY, Defendant.**

**Bankruptcy No. 92–04122–BKC–6C7.
Adv. No. 92–253.**

United States Bankruptcy Court,
M.D. Florida,
Orlando Division.

Oct. 25, 1993.

16

Scott W. Spradley, Orlando, FL, for plaintiff.

Raymond O. Bodiford, Orlando, FL, for defendant.

## MEMORANDUM OPINION

ARTHUR B. BRISKMAN, Bankruptcy Judge.[1]

This matter came before the Court on the complaint of the plaintiff, Signet Bank/Virginia, to determine the dischargeability of indebtedness owed to it by the defendant, Theodros Gelagay. Appearing before the Court were Scott W. Spradley, attorney for the plaintiff, Signet Bank/Virginia; and Raymond O. Bodiford, attorney for the debtor/defendant, Theodros Gelagay. After receiving testimony, exhibits and arguments of counsel, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

The defendant, Theodros Gelagay ("Gelagay"), was issued a VISA credit card from the plaintiff, Signet Bank/Virginia ("Signet"), in 1988. Gelagay acquired the VISA card by completing a pre-approved credit card application Signet furnished him. Signet reissued a subsequent card upon the expiration of the initial card. Signet did not perform any type of credit investigation either upon the issuance of the initial credit card or upon the renewal. In 1991 and 1992 the VISA card Gelagay acquired from Signet had a credit limit of $4,500.00.

Gelagay was employed as a taxi driver in Los Angeles, California from 1988 through March 1992. His income from operating the taxi in 1990 was $27,000.00 and $27,000.00 in 1991. Gelagay moved to Orlando, Florida from Los Angeles after March 1992. His income for the first three months in 1992, prior to moving to Orlando, was approximately $7,000.00. Gelagay sold his interest in the taxi business in April 1992 and received $27,000.00. He used a portion of the proceeds to pay creditors. Gelagay was unable to obtain work after moving to Orlando and was unemployed from April 1992 through January 1993.

Prior to and after the move to Orlando Gelagay had fixed monthly expenses of $695.00. He lived with a girlfriend who contributed support. Gelagay had been receiving telephone calls from other credit card issuers regarding delinquent obligations before departing Los Angeles. Gelagay had amassed $171,000.00 in debt with forty-four (44) credit cards when his chapter 7 bankruptcy petition was filed on July 8, 1992.

On March 15, 1992, Gelagay's Signet VISA card had a zero balance. Until that time he had been using the card and paying for his purchases accordingly. On March 16, 1992, while still employed in Los Angeles, Gelagay obtained a $4,500.00 cash advance on the Signet VISA card. The following day Gelagay obtained two $200.00 cash advances in Las Vegas, Nevada.[2] Gelagay obtained an-

1. The Honorable Arthur B. Briskman, United States Bankruptcy Judge for the Southern District of Alabama, sitting by designation pursuant to an order of the Judicial Council of the United States Court of Appeals for the Eleventh Circuit.

2. In regards to the $200.00 cash advances, a $15.99 services charge was assessed for each cash advance.

other $200.00 cash advance on March 31, 1992. Together with other charges, Gelagay soon had a balance of $5,430.15.

Gelagay used a portion of the $4,500.00 cash advance to satisfy other credit card indebtedness. Gelagay conceded he was 'robbing Peter to pay Paul.' After receiving the $4,500.00 cash advance, the three $200.00 cash advances and other charges, Gelagay made no further transactions with the Signet VISA card; nor did he make any further payments. Gelagay owed at least $97,000.00 in other credit card indebtedness at the time of the transactions in question.

At no time during the life of Gelagay's account with Signet did Signet perform a credit investigation to determine whether Gelagay was credit worthy. Signet made no attempt to determine the nature and extent of Gelagay's financial condition before Gelagay acquired the cash advances. Moreover, Signet made no unequivocal and unconditional revocation of Gelagay's credit card privileges prior to his receipt of the cash advances and the incurring of the other charges. Gelagay did not intend to defraud Signet even though he was incurring additional liabilities to reduce existing liabilities.

## CONCLUSIONS OF LAW

■ Signet seeks to except from the debtor's discharge the indebtedness owed to it by Gelagay because the debt was incurred while Gelagay was ladened with other financial obligations. Relying on this inference, Signet contends Gelagay obtained the cash advances and incurred the charges through "actual fraud" in contravention of 11 U.S.C. § 523(a)(2)(A). Exception to discharge are to be construed strictly to achieve the goal of

providing the debtor with the "fresh start" Congress intended.[3] *In re Hunter*, 780 F.2d 1577, 1579 (11th Cir.1986) (citing *Gleason v. Thaw*, 236 U.S. 558, 35 S.Ct. 287, 59 L.Ed. 717 (1915)).

■ Credit card issuers assume the risk of nonpayment when they issue a credit card and are compensated for this risk. The finance charge, which is typically higher than that charged by other lenders, factors in this risk. This risk, however, does not entitle credit card issuers like Signet to more protection under 11 U.S.C. § 523 than other creditors. *In re Ward*, 857 F.2d 1082, 1085 (6th Cir.1988) (citing *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983)). To hold otherwise would reward creditors for their failure to adequately investigate their account debtors' credit worthiness, discourage credit card issuers from adequately monitoring their accounts and permit a given credit card issuer to escape the consequences of its, and possibly others', negligence.

■ A credit card issuer assumes the risk of loss by a credit card holder until it is shown the credit card issuer unequivocally and unconditionally revoked the user's right to possession and use of the card and, further, that the user was aware of the revocation. *First National Bank of Mobile v. Roddenberry*, 701 F.2d 927, 932 (11th Cir.1983).[4] A credit investigation must be conducted at some point before an objecting creditor can establish the element of reliance to preclude the discharge of indebtedness. *In re Ward*, 857 F.2d 1082, 1085 (6th Cir.1988). Finding it was unreasonable for the credit card company to rely on the debtor's 'good faith' or implied 'promise of repayment,' the Sixth

---

**3.** "[A] central purpose of the [Bankruptcy] Code is to provide a procedure by which certain insolvent debtors can reorder their affairs, make peace with their creditors, enjoy a 'new opportunity in life with a clear field for future effort, unhampered by the pressure and discouragement of preexisting debt.'" *Grogan v. Garner*, 498 U.S. 279, 285, 111 S.Ct. 654, 659, 112 L.Ed.2d 755 (1991) (quoting *Local Loan Co. v. Hunt*, 292 U.S. 234, 244, 54 S.Ct. 695, 699, 78 L.Ed. 1230 (1934)).

**4.** In *Roddenberry*, the Eleventh Circuit Court of Appeals was construing section 17(a) of the

Bankruptcy Act of 1898, 11 U.S.C. § 35(a)(2), **repealed by** the Bankruptcy Reform Act of 1978, Pub.L. No. 95–598. Although the Eleventh Circuit Court of Appeals has yet to declare the extent to which *Roddenberry*, applies under 11 U.S.C. § 523(a)(2)(A), the Court is guided by the Sixth Circuit Court of Appeals' decision in *In re Ward*, 857 F.2d 1082 (6th Cir.1988). Although factually dissimilar from *Roddenberry*, the Sixth Circuit followed *Roddenberry*, and was decided under the Bankruptcy Code, 11 U.S.C. § 101 *et seq.*

Circuit cited *In re Hunter*, 780 F.2d 1577 (11th Cir.1986) for the proposition that "'misplaced trust is insufficient for nondischargeability.'" *In re Ward*, 857 F.2d at 1085 (citing *In re Hunter*, 780 F.2d at 1580).[5]

A minimal investigation by Signet may have discovered the nature and extent of Gelagay's liabilities. Signet may have determined that Gelagay's credit never should have been extended, or warranted reduction or that the cash advances were an improvident extension of credit. However, from the outset of its relationship with Gelagay, Signet failed to take any measure to determine Gelagay's accountability for the credit it was extending. At no time after the expiration of the initial VISA card, the reissuance of the subsequent card or the increasing of Gelagay's credit limit did Signet request updated information regarding Gelagay's financial condition.

Signet seeks to except the indebtedness owed to it by Gelagay complaining the extent of Gelagay's credit card obligations at the time of the transactions in question warrant the conclusion that due to the size of his credit card indebtedness and the prospects of repayment, Gelagay incurred the charges with an intent to defraud Signet. Excepting the debt from the discharge on the basis of this inference contradicts the strict construction accorded to 11 U.S.C. § 523. Moreover, Signet offered no evidence suggesting Gelagay incurred the charges with the requisite intent to defraud. Gelagay's belief that he would continue to be able to repay his indebtedness with the income from operating the taxi, his 'robbing Peter to pay Paul' and his loss of income subsequent to his incurring the charges in question demonstrates the lack of intent to defraud Signet that 11 U.S.C. § 523 exacts.

5. In *In re Hunter*, the Eleventh Circuit Court of Appeals held to preclude the dischargeability of indebtedness pursuant to 11 U.S.C. § 523(a)(2)(A), a creditor must prove: the debtor made a false representation with the purpose and intention of deceiving the creditor; *the creditor relied on such representation; his reliance was reasonably founded;* and the creditor sustained a loss as a result of the representation.

Accordingly, since there was no evidence of a communication of the revocation of Gelagay's credit privileges, no evidence that Signet conducted a credit investigation at any time and no evidence establishing an intention by Gelagay to defraud Signet, the indebtedness owed by Gelagay to Signet will be discharged if and when a discharge is granted in this case.

*In re Hunter*, 780 F.2d at 1579 (emphasis added). More importantly, the court concluded "the debtor *must be guilty of positive fraud, or fraud in fact, involving moral turpitude or intentional wrong, and not implied fraud, or fraud in law, which may exist without the imputation of bad faith or immorality.*" *In re Hunter*, 780 F.2d at 1579 (citations omitted) (emphasis added).