In re Lisa A. RENEER a/k/a
Lisa A. Gott, Debtor.

AT&T UNIVERSAL CARD SERVICES,
CORP., a Delaware Corporation,
Plaintiff,

v.

Lisa A. RENEER, a/k/a Lisa
A. Gott, Defendant.

Bankruptcy No. 96–1967–BKC–3F7.
Adversary No. 96–368.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

May 9, 1997.

732

Lance Paul Cohen, Jacksonville, FL, for Plaintiff.

Lansing J. Roy, Jacksonville, FL, for Defendant.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This Proceeding is before the Court on a Complaint to Determine Dischargeability of Consumer Debt pursuant to 11 U.S.C. § 523(a)(2). (Doc. 1). A trial was held on February 14, 1997. Based upon the evidence presented at trial, the Court enters the following Findings of Fact and Conclusions of Law.

### FINDINGS OF FACT

Although this Proceeding involves unsecured consumer credit card debt in a Chapter 7 Case where the law is fairly settled under Eleventh Circuit precedent, the Court felt that the actual facts of this Case were somewhat atypical and required further exploration. Lisa Reneer ("Defendant") is a single parent, raising two children, ages six and eight. (Transcript of 2/14/97 Trial [hereinafter Tr.] at 95–6). She was divorced in 1993, her former married name being Lisa A. Gott. (Tr. at 27, 1.16–17). From September 10, 1990 until her voluntary resignation in January of 1996, Defendant was an employee of the Plaintiff, AT&T Universal Card Services Corporation. (Tr. at 10, 1.1; 35, 1.4–6).

While in the Plaintiff's employ, the Defendant held various positions. (Tr. 10–13). First, Defendant was a Credit Analyst and was trained how to read credit bureau reports, how to analyze credit card applications and how to service customers. (Tr. at 10, 1.10–12). Additionally, Defendant learned customer income requirements and corresponding credit limits for various AT&T products. (Tr. at 10, 1.13–19). She held that position for approximately ten months; however, four out of those ten months, she was placed on loan to the AT&T Fraud Department, where she examined accounts for credit card abuse, analyzing abuse by persons other than the card holder utilizing the credit line. (Tr. at 12, 1.9–11). For the following two and a half years, Defendant was a Customer Service Representative, where she addressed customer concerns and upgraded customers to higher credit limit products. (Tr. at 12–13). From that position she became a Code 10 Investigator where she was responsible for investigating fraudulent use of credit cards by parties other than the credit card holders at the point of sale. (Tr. at 13, 1.15–19).

In 1991, Defendant obtained her first AT&T credit card, a Classic Visa. (Tr. at 96, 1. 5–15). In March 1995, Defendant had exceeded her credit limit by approximately $800.00. (Tr. at 14, 1.11–14). With the credit limit on the Classic Visa being $5,000, she became automatically eligible for an AT&T Gold Master Card. (Tr. at 14, 1.6–10). Defendant requested a Gold Mastercard, which AT&T issued to her in March 1995. (Tr. at 14, 1.5–17; Def.'s Ex. 1). Although Defendant had exceeded her Classic Visa's credit limit by $800.00 when she applied for her Gold Mastercard, her credit limit was increased to $6,500.00, which cured the over limit amount. (Tr. at 16, 1.5–14). Defendant received her first Gold Mastercard billing statement on or before April 10, 1995. (Tr. at 18). The Statement showed $707.00 in charges and reflected that AT&T had not transferred the balance from her Classic Visa to her Gold Mastercard. (Tr. at 19, 1.9–14; Pl.'s Ex. 2). During the next billing cycle (April 4 to May 3, 1996), she charged approximately an additional $1,250.00 on her card.

(Tr. at 19; Pl.'s Ex.2). Forty-five days after her request for the Gold card, the balance was transferred from the Classic Visa to the Gold Mastercard. (Tr. at 16–17). As a result of the transfer, the balance on the Gold card was $7,653.00, which placed Defendant $1,153.00 over her credit limit on the Gold card. (Tr. at 19–20; Pl.'s Ex.2). The first statement after the transfer listed a minimum payment of $1,353.00. (Tr. at 20, 1.9–10; Pl.'s Ex. 2).

Mrs. Brown, a recovery manager for the Plaintiff, testified that AT&T has a "cushion" for the over limit fee, which is a policy whereby if a card holder is over his credit limit by a certain percentage, normally 10%, AT&T would not assess an over limit fee. (Tr. at 75, 1.21–25). This cushion applied to all customers, not just employees of AT&T. (Tr. at 76, 1.2–4). Brown testified that Defendant fell within the cushion (Tr. at 75, 1.21–25), as the Gold account reached $7,653.00 in June of 1995, and she was not charged an over limit fee until September 1995. (Def.'s Ex. 1).

AT&T never advised the Defendant that her credit privileges had been terminated or suspended. (Tr. at 122, 1.15–18). AT&T's policy was that as long as a customer paid 2.1% of the outstanding balance no overdue fee would be assessed. (Tr. at 121, 1. 10–12). On Defendant's Gold account, the first past due charge was in the September 3, 1995 statement. (Def.'s Ex. 1). This same statement was the first statement on which the over limit fee was assessed. (Def.'s Ex. 1).

Another wrinkle in this tale involves the third card issued by AT&T to the Defendant. In May of 1995, AT&T sent a solicitation to Defendant in her former married name, Lisa A. Gott, at her parents' address. (Tr. at 27; Pl.'s Ex. 4). Defendant filled in the information requested in the application signing her name as "Lisa A. Gott," which was the name on her utility bill and several other bills. (Tr. at 28, 1.22–23; Pl.'s Ex.4). Defendant did not correct her name or address on the application. (Tr. at 28, 1.11–13; Pl.'s Ex.4). Defendant testified that although she knew she should have corrected the information, she did not, as she knew that the changing of the application would result in the delay of the issuance of a new card. (Tr. at 107–108). The change of any information would result in a personal investigation of that applicant, which included a new credit bureau report being pulled in the corrected name that the applicant had written on the application and a determination by AT&T whether the applicant already had an AT&T credit card in that name. (Tr. at 108). Furthermore, Defendant testified that she believed at that time that her credit report would be good under either name and that she thought that credit bureaus operated on social security numbers, not names and addresses. (Tr. at 108; 110–111).

On May 11, 1995, when Defendant signed and sent in the application, she was $1,600.00 to $1,700.00 over the credit limit on her Gold Mastercard. (Tr. at 29). Being over her credit limit would have stopped the issuance of the second card. (Tr. at 66). Within twenty-one (21) days of receiving her new AT&T Mastercard with a credit line of $2,000.00, she incurred just over $2,000.00 in credit card charges. (Tr. at 29, 1. 17–19). The majority of the charges involved a planned family vacation to Maine in June of 1995. (Tr. at 29–30). Defendant testified that it was out of the ordinary for her to spend $2,000.00 on a single card in a period of three weeks. (Tr. at 31, 1.16–18). Mrs. Brown testified that it is a permitted use of an AT&T card to charge up the full credit amount in thirty days, and further it is a permitted use to get a cash advance of the full credit amount on its first day of issuance or even to spend the full credit amount on a single vacation. (Tr. at 87). The first statement on this new card stated a minimum payment of $101.63. (Tr. at 89, 1.1–7; Def.'s Ex. 1). Defendant paid $60.00 on July 27, 1995 on this account, which was the only payment she made on this card. (Tr. at 89, 1.1–7; Def.'s Ex.1).

Defendant also made a $140.00 payment on the Gold Mastercard, which showed up on the May 3, 1995 statement, and two payments totaling $300.00 on the same card which showed up on the July 3, 1995 statement. (Def.'s Ex. 1). One payment was made just days after returning from her vacation (Tr. at 74, 1.10–11). Plaintiff's wit-

ness, Mrs. Brown, even testified that the three payments on the Gold Mastercard demonstrated that the Defendant was trying to honor her obligations to AT&T. (Tr. at 75, l.3–5).

Additional complications arose for the Defendant when her former husband stopped making his $200.00 per month child support payment just prior to the family vacation in June of 1995, and he did not recommence payment until September 1995. (Tr. at 112). With the accumulation of these problems, Defendant met with Tony Montesion, Vice-president of Risk Management at AT&T Universal Card Services who was Defendant's direct supervisor. (Tr. at 113). Although not able to consolidate all of her debt on one card, Mr. Montesion suggested two options: consumer credit counseling or bankruptcy. (Tr. at 114, l.22–23). Defendant testified that she could not fathom filing bankruptcy because of her job, and she did not want to be called a "deadbeat" which is what AT&T employees refer to customers of AT&T who file bankruptcy. (Tr. at 115). Defendant met with bankruptcy attorney, David King, in September 1995. (Tr. at 115–116). In January 1996, due to impending downsizing of management in the AT&T corporation, Defendant voluntarily terminated her employment for a severance pay of $13,-000. (Tr. at 116–117). After months of trying to get caught up and better her financial situation, she filed a voluntary Chapter 7 petition on April 3, 1996.

Prior to all of the above stated events, Defendant had a fairly good account with AT&T (Tr. at 72, l.10–13). No special perks were offered to the Defendant as an employee of AT&T (Tr. at 78, l.20–23). AT&T's complaint seeks to except $10,482.69,[1] plus interest and attorney fees pursuant to 11 U.S.C. § 523(a)(2)(A).

### CONCLUSIONS OF LAW

■ Section 523 (a)(2)(A) provides:

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(a) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition.

11 U.S.C. § 523(a)(2)(A) (1997). Plaintiff has the burden of proving the debt should be excepted from the Defendant's discharge by a preponderance of the evidence. *Grogan v. Garner,* 498 U.S. 279, 291, 111 S.Ct. 654, 661, 112 L.Ed.2d 755 (1991).

■ Courts in the Eleventh Circuit are bound by the decision in *First Nat'l Bank of Mobile v. Roddenberry,* 701 F.2d 927 (11th Cir.1983), in which the court rejected the "implied misrepresentation" doctrine of credit card fraud, following instead the "voluntary assumption of risk" doctrine. The court stated,

[t]he element of risk is inherent in the issuance of bank credit cards. Our 'credit-card economy' encourages widespread voluntary risk-taking on the part of those issuing cards. Once credit cards are issued (if not fraudulently obtained), the bank has agreed to trust the cardholder and to extend credit, and once credit is extended, the bank must decide when and if credit will be revoked.... Banks are willing to risk non-payment of debts because that risk is factored into the finance charges.... [T]he voluntary assumption of risk on the part of the bank continues until it is clearly shown that the bank unequivocally and unconditionally revoked the right of the cardholder to further possession and use of the card, and until the cardholder is aware of this revocation.

*Id.* at 932. The provision of § 523(a)(2)(A) most often used by courts is the "actual fraud" statement. Is the Defendant guilty of actual fraud because she misrepresented that she had the intention to pay for the charges incurred? To sustain an exception to discharge under § 523(a)(2)(A) for actual fraud,

---

1. However, in Plaintiff's Post Trial Memorandum of Law (Doc. 16), the Plaintiff seeks to except $4,710.70 from the Defendant's discharge. The

Plaintiff conceded that the $5,800.00 on the Classic Visa was dischargeable. (Doc. 16 at 15).

a creditor must prove by a preponderance of the evidence that

(1) the defendant made materially false representations;

(2) that at the time he made them he knew the representations were false;

(3) that he made them with the intention of deceiving the other party;

(4) that the other party relied upon those representations; and

(5) that the other party sustained damages as the proximate result of those misrepresentations.

*In re Landen,* 95 B.R. 826, 828 (Bankr. M.D.Fla.1989) (Proctor, J.).

■ The most common misrepresentation charged by a creditor is that the defendant misrepresented that he had the intention to pay for the charges incurred. In *Citibank South Dakota v. Dougherty (In re Dougherty),* 84 B.R. 653 (9th Cir. BAP 1988), the court developed a list of factors to determine whether a particular defendant intended to repay his creditor when he incurred charges on his credit card account. These factors have been adopted and used by a number of other courts throughout the country. *See, e.g., Landen,* 95 B.R. at 829; *Household Credit Services v. Rivera (In re Rivera),* 151 B.R. 602 (Bankr.M.D.Fla.1993). These factors include:

(1) The length of time between the making of the charges and the filing of bankruptcy;

(2) Whether or not an attorney had been consulted concerning the filing of bankruptcy before the charges were made;

(3) The number of charges made;

(4) The amount of the charges;

(5) The financial condition of the debtor at the time the charges are made;

(6) Whether the charges were above the credit limit of the account;

(7) Were there multiple charges on the same day;

(8) Whether or not the debtor was employed;

(9) The financial sophistication of the debtor;

(10) Whether there was a sudden change in the debtor's spending habits; and

(11) Whether the purchases were made for luxuries or necessities.

*Landen,* 95 B.R. at 829.

■ Addressing the Defendant's intent to repay the Plaintiff, the Court has applied the foregoing factors to the specific facts in this Proceeding. The first factor, focusing on the length of time between the making of the charges and the filing of bankruptcy, weighs heavily in the Defendant's favor. The last purchase on the $2,000 credit card was on July 11, 1995, and the last cash advance was on June 12, 1995. (Def.'s Ex. 1). On the June 3, 1995 statement, the balance on the Classic Visa was transferred to the Gold Mastercard; the last charges took place on April 25, 1995, and the last cash advance was on April 24, 1995. (Def.'s Ex. 1). The Defendant filed bankruptcy on April 3, 1996, approximately nine months after the last transaction was made on any of the three credit cards in question.

The second factor which considers whether or not an attorney had been consulted concerning the filing of bankruptcy before charges were made weighs in the Defendant's favor. It is uncontroverted that Defendant did not consult with a bankruptcy attorney until September 1995, after the accounts were without activity since July of 1995. (Tr. at 115–116). Even considering that she consulted Mr. Montesion, who is not an attorney, about different courses of action to take concerning her financial problems, she consulted him in August of 1996, which again is subsequent to all the charges made on the accounts. (Tr. at 113). Therefore, no fraudulent intent can be inferred from her actions.

Focusing on the third factor, which considers the number of charges made, the Court has examined the billing statements in evidence. However, without evidence of past spending habits and charging habits, the Court is unable to find fraudulent intent in the pattern in which the Defendant used the credit cards. However, as to the $2,000.00 credit card solicited under the name of Gott, the Defendant admitted that she would not normally run up an account in the course of

three weeks. (Tr. at 31, 1.16–18). Even with this statement, the Court finds that this does not evidence fraudulent intent as the Plaintiff's witness, Mrs. Brown, testified that permitted uses of the cards include charging the whole limit in one day or even using a cash advance for the full amount. (Tr. at 86–87). Likewise, the fourth factor, which focuses on the amount of the charges, does not exhibit fraudulent intent on part of the Defendant. Examining the billing statements in evidence, the Court does not find that it can infer fraudulent intent from any of the charges made.

The fifth factor focuses on the financial condition of the Debtor at the time the charges were made. Defendant admitted that her liabilities exceeded her assets when the charges were made. (Tr. at 34). However, the Defendant also testified that her ex-husband had not made his child support payments for the months of June, July, and August of 1995. (Tr. at 112). The payments were for $200.00 each, and the Defendant relied on these payments as a source of income. (Tr. at 112). If the child support payments had been current during this period, Defendant would have been able to make a 2.1% payment on the credit cards, which would have kept her from being past due on the accounts. (Tr. at 123). Mrs. Brown testified that as of March of 1995, the Defendant's accounts were in fairly good shape, having made ten out of her eleven payments. (Tr. at 72). Furthermore, Brown testified that she believed the payments that the Defendant made on the accounts during the summer of 1995 evidenced the Defendant's intent and attempt to meet her obligation to AT&T. (Tr. at 75, 1.3–5). Defendant believed that at the time the charges were made, she could make the payments. Defendant presented evidence that she made between $26,000 to $28,000 a year while in the Plaintiff's employ. (Tr. at 13, 1.22–23). Poor money management skills do not constitute fraud under § 523(a)(2)(A). Likewise, the Court may question one's attitude in attempting to evade what seems to an outsider as the inevitable; however, that is not fraud under § 523(a)(2)(A).

The sixth factor takes into consideration whether the charges were above the credit limit. The Defendant admitted that all of the AT&T credit cards she held were at the time in question over the limit. The Classic Visa was already over the $5,000.00 limit by $800.00 at the time she transferred the balance. (Tr. at 16, 1.5–14). However, with the transfer of the balance to the Gold Mastercard, this over limit was cured. (Tr. at 16). The balance on the Gold Mastercard exceeded the credit limit by $1,153.00 (Pl.'s Ex.2), and on the $2,000.00 credit card, the limit was extended by nominal amounts. (Pl.'s Ex.3).

Nonetheless, in the typical credit card dischargeability case under § 523(a)(2)(A), extension over the card holder's credit limit may evidence fraudulent intent, but it does not when applied to the specific facts of this Proceeding. As shown at trial, Defendant was aware of the "allowable limits" which AT&T set for their clients. She knew exactly how far the limits could be stretched without being penalized. Her inside knowledge and use of the system does not evidence fraudulent intent. Furthermore, at no time did AT&T advise Defendant that her credit privileges had been terminated or suspended.

The seventh factor considers whether multiple charges were made on the same day. A review of the billing statements demonstrates that multiple charges were incurred on the same day. However, the Court does not find that such multiple charges demonstrate a fraudulent intent on the part of the Defendant.

The eighth factor is easily disposed of as the whole Case seems to revolve around the Defendant being in the Plaintiff's employ at the time the alleged fraud occurred. Plaintiff contends that Defendant manipulated and defrauded the Plaintiff, due to her position and training in the industry and the knowledge she gained while being in the Plaintiff's employ. The Court does not believe that it can draw an inference that she took advantage of her job. If she really wanted to defraud the Plaintiff, she could have made purchases or obtained cash advances for the total sum of $6,500.00 on the new card before the balance transferred. Furthermore, it is

not bad faith or fraud to use the system to take full advantage of the inner knowledge of a business, and this she did; however, the whole time, she maintained her intent to repay.

The ninth factor investigates the financial sophistication of the Defendant. Again, it is Plaintiff's contention that Defendant's employment with the Plaintiff gave her superior knowledge which enabled her to manipulate the system. Although the Court finds that the Defendant's knowledge of the industry was superior to that of a typical card holder, the Court does not find that the Defendant used the system in any manner inconsistent with the typical card holder or that Defendant was given any special "perks" which she abused to the detriment of the Plaintiff.

The tenth factor queries whether a sudden change happened in the Defendant's spending habits. Although Defendant admitted that it was not typical for her to charge the whole credit limit in a period of three weeks (Tr. at 31, 1.16–18), this evidence needs to be taken in the light of the totality of the circumstances. Furthermore, Plaintiff failed to present any evidence as to Defendant's past spending habits.

Lastly, the Court is called upon to determine whether or not the charges were incurred for luxuries or necessities. Specifically as it relates to the $2,000.00 credit card, the majority of the charges were for a family vacation, which seemingly would be categorized more as a luxury than a necessity; however, the line is not clearly drawn. This vacation was to visit family and was not a "luxury" vacation. There was no evidence presented that she ate at gourmet restaurants or that she stayed at resort hotels. When taken out of the context of "vacation," the charges were for necessities—such as food, rooming, and gas.

Therefore, after a review of the eleven factors which are indicators of fraudulent intent, the Court does not believe that the Plaintiff proved by a preponderance of the evidence that Defendant intended to defraud the Plaintiff. Being bound by precedent set by the Eleventh Circuit in *Roddenberry*, the Court cannot imply that a misrepresentation of ability to pay occurred.

A separate judgment will be entered in accordance with the foregoing.

## *JUDGMENT*

This Proceeding is before the Court on a Complaint to Determine Dischargeability of Consumer Debt pursuant to 11 U.S.C. § 523(a)(2). (Doc. 1). A trial was held on February 14, 1997. Based upon the Findings of Fact and Conclusions of Law separately entered, it is

## ORDERED:

The debt owed by the Defendant, Lisa A. Reneer, a/k/a/ Lisa A. Gott, to the Plaintiff, AT&T Universal Card Services, Corp. is dischargeable.