**In re Anthony C. McLEROY and Sheila K. McLeroy, Debtors.**

**AT & T Universal Card Services, Plaintiff,**

v.

**Anthony C. McLeroy and Sheila K. McLeroy, Defendants.**

**Bankruptcy No. 98–12658.**
**Adversary No. 98–1330.**

United States Bankruptcy Court,
N.D. Mississippi.

May 13, 1999.

John L. Pannier, Bennett Lotterhos Sulser & Wilson, PA, Jackson, MS, for AT & T Universal Card Services.

Tracy Buster Walsh, Southhaven, MS, for Anthony C. McLeroy and Sheila K. McLeroy.

*OPINION*

DAVID W. HOUSTON, III, Bankruptcy Judge.

On consideration before the court is the complaint filed by the plaintiff, AT & T Universal Card Services (AT & T), seeking a determination of the dischargeability of a certain indebtedness owed by the debtors/defendants, Anthony C. McLeroy and Sheila K. McLeroy; answer having been filed by the defendants; on proof in open court; and the court, having heard and considered same, hereby finds as follows, to-wit:

I.

The court has jurisdiction of the parties to and the subject matter of this proceeding pursuant to 28 U.S.C. § 1334 and 28 U.S.C. § 157. This is an adversary proceeding as defined in 28 U.S.C. § 157(b)(2)(I).

II.

In the pre-trial order, the parties stipulated to the following:

a. The plaintiff is a creditor of the defendants and is the holder of the claim against the defendants.

b. The defendants filed a Chapter 7 petition on June 8, 1998.

c. This adversary proceeding is being brought in connection with defendants' case under Chapter 7 of Title 11 in Case No. 98–12658, now pending in this court.

d. This court has jurisdiction over this adversary proceeding pursuant to 28 U.S.C. § 157, § 1334 and 11 U.S.C. § 523.

e. This is a core proceeding under 28 U.S.C. § 157(b)(2)(I).

f. The defendants previously held a credit card issued by the plaintiff.

g. The defendants received and used the credit card during the months in question in this adversary proceeding.

h. The defendants incurred charges on said account.

i. There is now due and owing by the defendants to the plaintiff the sum of $9,425.46 plus interest at the contract rate from and after June 8, 1998.

j. The Defendants opened their account with the Plaintiff on April 6, 1995.

k. In October of 1997 the debtors' obtained a second mortgage on their home in order to pay off their debts.

l. As of December 7, 1998, the debtors' account balance was zero.

m. On December 8, 1997, the defendants used the credit card to obtain a cash advance in the sum of

$8,000.00 plus finance charges from Deposit Guaranty National Bank at Bullfrog Corner in Horn Lake, Mississippi.

n. On January 16, 1998, the debtors made a payment of $1,250.00 on their account.

o. Between February 26, 1998 and March 6, 1998, the debtors used the card to make nine (9) purchases totaling $482.30 plus finance charges.

p. Between March 12, 1998 and April 7, 1998, the debtors used the card to make seven (7) purchases totaling $731.69 plus finance charges.

q. On March 19, 1998, the debtors obtained a cash advance in the amount of $1,048.99 plus finance charges from the Horseshoe Casino in Robinsonville, Mississippi ostensibly for gambling purposes.

r. After April 10, 1998, the debtors made no payments on their account.

s. On May 1, 1998, the debtors used the card to make two (2) purchases totaling $168.92 plus finance charges from Lerner Catalogue.

t. As of June 15, 1998, the debtors' credit limit had been reduced to zero due to lack of any payments on the account.

u. Between May of 1995 and April of 1998 the debtors never missed a payment and were never late on a payment.

v. The debtors' credit limit was raised from $6,000.00 to $10,600.00 over time because of their good credit history.

w. The difference between debtors' Schedule I, Income, and Schedule J, Expenditures, is $73.00 in disposable income.

x. The debtors' Schedule F, Unsecured Creditors, reveals $62,652.99 in non-medical claims.

y. Sheila McLeroy developed a gambling problem.

z. Sheila McLeroy never informed AT & T Universal Card Services she was developing or had developed a gambling problem.

### III.

The issue that must be determined by the court is whether the indebtedness in the sum of $9,425.46, plus interest at the contract rate from and after June 8, 1998, owed by the defendants to the plaintiff, is non-dischargeable pursuant to the provisions of 11 U.S.C. § 523(a)(2), which provides as follows:

§ 523. Exceptions from discharge.

(a) A discharge under section 727, 1141, 1228(a), 1228(b), or 1328(b) of this title does not discharge an individual debtor from any debt—

. . . .

(2) for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by—

(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition;

(B) use of a statement in writing—

(ii) respecting the debtor's or an insider's financial condition;

(iii) on which the creditor to whom the debtor is liable for such money, property, services, or credit reasonably relied; and

(iv) that the debtor caused to be made or published with intent to deceive; or

In this proceeding the plaintiff's allegations focus essentially on § 523(a)(2)(A), which requires the following elements to be proved:

1. The debtor made a representation. (This is generally easy to prove, since the debtor used the credit card, representing that he would honor the card agreement.)

2. The representation was false. (This can be somewhat difficult to prove since the creditor must establish that the debtor had an inability to repay the credit card debt.)

3. The representation was made with the intention of deceiving the creditor. (This can be even more difficult to prove since the creditor must establish the subjective element of the debtor's fraudulent intent.)

4. The creditor *justifiably* relied on the fraudulent representation. (The U.S. Supreme Court's decision in *Field v. Mans,* 516 U.S. 59, 116 S.Ct. 437, 133 L.Ed.2d 351 (1995), indicated that the standard of reliance was *justifiable,* rather than *reasonable,* in contrast to those cases brought under § 523(a)(2)(B).)

5. The creditor sustained damages as a result of the fraudulent representation. (This is fairly easy to prove since the creditor obviously sustained damages when the credit card debt was not repaid.)

Clearly, the most obstinate elements for a creditor to overcome in proving the nondischargeability of credit card debts are the false representation and the fraudulent intent requirements set forth as items 2 and 3 hereinabove. The next most obstinate element is proving justifiable reliance on the part of the creditor.

■ When a debtor uses a credit card, he or she makes an implied representation that there is an ability to repay the debt, as well as, an intent to repay the debt.

Initially, courts focused on the debtor's ability to repay rather than the intent to repay. This became very pro-creditor, i.e., the debtor's distressed financial condition translated into a debt excepted from discharge. This approach began to change quickly for two obvious reasons:

a. Courts began to realize that most people who use a credit card simply don't have the immediate ability to re-

pay the debt. Otherwise, why use the card in the first place?

b. Credit card issuers were encouraging users to maintain a balance in their accounts. One company even initiated a program of charging customers a flat fee of $30.00 per month for having a zero balance in their accounts. See *Sears Roebuck and Co. v. Hernandez,* 208 B.R. 872 (Bankr.W.D.Tex.1997).

The courts then began turning their focus to the debtor's intent to repay the debt. See *MBNA America v. Simos,* 209 B.R. 188 (Bankr.M.D.N.C.1997), and *AT & T Universal Card Services Corp. v. Reneer (In re Reneer),* 208 B.R. 731 (Bankr. M.D.Fla.1997).

The Ninth Circuit decision in *In re Anastas,* 94 F.3d 1280 (9th Cir.1996), created an almost impossible burden for a creditor to prevail in a credit card nondischargeability case. In *Anastas,* the debtor had incurred sizeable gambling losses utilizing his credit card for cash advances while he was obviously insolvent. The court held, however, that an inability to pay alone was not sufficient to presume a lack of intent to repay. This meant that the creditor had to prove that the debtor, when the charge was incurred, could not have realistically expected to repay the debt, and, in fact, did not intend to do so.

Those courts which continue to follow the *Anastas* approach, and there are several that do, provide a most unfavorable forum for a creditor seeking to have a debtor's credit card debt excepted from discharge.

Another approach to establishing fraudulent intent in credit card cases has actually been in existence since the issuance of the Ninth Circuit Bankruptcy Appellate Panel's *Dougherty* decision in 1988. (*In re Dougherty,* 84 B.R. 653 (9th Cir. BAP 1988).)

In *Dougherty,* the court crafted a totality of the circumstances test, examining a non-exclusive list of twelve objective factors, to determine whether a credit card

debt was incurred through fraud. These factors included:

1. The length of time between when the charges were made and the filing of bankruptcy;
2. Whether or not an attorney had been consulted concerning the filing of the bankruptcy case before the charges were made;
3. The number of charges made;
4. The amount of the charges;
5. The financial condition of the debtor at the time the charges were made;
6. Whether the charges were above the credit limit of the account;
7. Whether the debtor made multiple charges on the same day;
8. Whether or not the debtor was employed;
9. The debtor's prospects for employment;
10. The financial sophistication of the debtor;
11. Whether there was a sudden change in the debtor's buying habits; and
12. Whether the purchases made were for luxuries or necessities.

In a case preceding the *Anastas* decision, the Ninth Circuit cited the *Dougherty* factors in *In re Eashai*, 87 F.3d 1082 (9th Cir.1996), reasoning that the twelve factors were relevant to an objective analysis of the debtor's intent.

Drawing from those courts that had earlier stated that an inability to pay should translate into an exception from discharge, the *Dougherty* twelve part test includes an analysis of the debtor's financial condition. However, although it is only one factor, it is given substantial weight in the ultimate conclusion.

The third and most recent decision from the Ninth Circuit is *In re Hashemi*, 104 F.3d 1122 (9th Cir.1996). This decision "levels the playing field" in the opinion of many. The *Hashemi* court, perhaps recognizing the onerous burden placed on creditors by the *Anastas* decision, decided that the creditor needed to prove only that the relevant facts supported a finding that the debtor did not intend to repay the charges at the time they were incurred. The *Hashemi* court specifically pointed to the twelve *Dougherty* factors and stated, "these factors are nonexclusive; none is dispositive, nor must a debtor's conduct satisfy a minimum number to prove fraudulent intent. So long as, on balance, the evidence supports a finding of fraudulent intent, the creditor has satisfied this element." *In re Hashemi*, 104 F.3d at 1125.

An appeal of this decision was taken to the U.S. Supreme Court, but the court refused to grant certiorari. Perhaps, the Supreme Court should have considered this case since it presented an opportunity for the court to establish a uniform national standard as to the element of fraudulent intent in credit card dischargeability cases.

## IV.

■ Considering the "totality of circumstances" test, developed by the twelve *Dougherty* factors, the court has examined the relevant factual underpinnings of this proceeding as developed by the proof:

1. The primary thrust of the plaintiff's complaint focuses on two cash advances obtained by the defendants, to-wit: December 8, 1997—$8,000.00, and March 19, 1998—$1,048.99. Both of these cash advances were used in furtherance of the defendants' casino gambling activities. The other charges incurred by the defendants on their credit card in early 1998 were either nominal in amount or were for purchases of ordinary consumer goods.

2. The defendants opened their credit card account with AT & T on April 6, 1995. The history of the defendants' use of this credit card (see Exhibit P–1) includes many occasions where the defendants obtained cash advances to engage in casino gambling by negotiating "convenience checks" or "Comcheks."

Before April, 1998, the defendants never missed a payment on their account and were never late on a payment. Indeed, in October, 1997, the defendants, through the execution of a second mortgage encumbering their home, reduced their AT & T account balance to zero. Even after the cash advance of $8,000.00 on December 8, 1997, the defendants made a payment on their account in the sum of $1,250.00 on January 16, 1998.

3. During the three year period that the defendants used their AT & T credit card, the credit limit was raised from a beginning level of $6,000.00 up to $10,600.00. The defendants never exceeded their allowed credit limit at any time.

4. The evidence does not indicate that the defendants' use of the AT & T credit card was for the purpose of "loading up" in contemplation of bankruptcy.

5. The defendants first contacted their bankruptcy attorney in April, 1998, months after the major charge had been incurred and filed the above captioned case on June 8, 1998.

6. Mrs. McLeroy, who suffers from "disassociative disorder," is unemployed and is currently drawing disability payments. She candidly admitted that she developed a gambling addiction which primarily contributed to her deteriorated financial condition.

7. Both defendants testified that they fully intended to repay AT & T for all charges that they incurred on the credit card when these charges were made. Considering their past history, which reflects that they consistently repaid their debts to AT & T, there was no doubt cast upon their credibility. The court was able to observe the demeanor of both defendants while they were testifying, and both appeared to be candid and honest with their responses.

The circumstances in this adversary proceeding weigh more heavily in favor of the defendants' discharge. Considering all of the pertinent facts, the court concludes that the defendants did not have the requisite intent to deceive AT & T when they incurred charges on their credit card from December, 1997, through April, 1998. As such, the complaint filed by the plaintiff must be dismissed with prejudice.

## V.

The court has reviewed the opinion written by Judge Edward Gaines in *AT & T Universal Card Services v. Mercer (In re Mercer)*, 220 B.R. 315 (Bankr.S.D.Miss. 1998). The factual analysis in that decision could serve as a script for the preissuance/investigatory actions of AT & T in the proceeding presently before this court. In that case, Judge Gaines concluded that AT & T did not justifiably rely on the representations of Ms. Mercer. However, he specifically noted in footnote 5 that he did not necessarily conclude that the element of reliance could not be established in a case where the debtor had demonstrated a good credit history with the creditor over a significant period of time by prompt payments.

Because the court has concluded that the totality of the circumstances indicates that the debtor did not have the requisite intent to deceive AT & T, the issue of justifiable reliance will not be addressed by the court.

## VI.

█ The request of the defendants for an award of costs and attorney's fees pursuant to 11 U.S.C. § 523(d) will be denied. Under the circumstances of this proceeding, such an award would be unjust.

An order will be entered consistent with this opinion.