**In re Robert FRETWELL and Nora Fretwell, Debtors.**

No. 01–1118–3F3.

United States Bankruptcy Court,
M.D. Florida,
Jacksonville Division.

March 19, 2002.

Lansing J. Roy, Jacksonville, FL, for Debtors.

Mamie L. Davis, Jacksonville, FL, Trustee.

### FINDINGS OF FACT AND CONCLUSIONS OF LAW

JERRY A. FUNK, Bankruptcy Judge.

This case came before the Court upon the Trustee's Motion to Dismiss for Bad Faith Filing and Objection to Confirmation. Upon the evidence presented and

the arguments of the parties, the Court makes the following Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

In 1990 Mr. Fretwell retired from Bell-South and began receiving monthly pension benefits. (Tr. At 14.) Several years later Mr. Fretwell returned to work part time in order to augment the household income. (Tr. At 14.) Beginning in 1995 Mrs. Fretwell worked full-time for the same employer, earning $575.00 per week as a payroll administrator. (Debtors' Ex. 11; Tr. At 14.)

Beginning in May 1995 Mrs. Fretwell suffered chronic and occasionally debilitating lower back pain, culminating in an acute attack in July 1998 which rendered her virtually immobile for nine or ten months. (Debtors' Ex. 3; Tr. at 10.) Additionally, she suffered from high blood pressure and diabetes. (Debtors' Ex. 1.) In September 1998 Mrs. Fretwell's doctor advised her to work no more than six hours a day because of her health problems. (*Id.*) In December 1997 Mr. Fretwell had cancer surgery followed by six months of chemotherapy. (Tr. at 10.) Debtors are 72 and 64 respectively.

Debtors lived in a home they had purchased in 1974. (Tr. at 5.) Debtors' monthly mortgage payments were $1,637.00. (Tr. at 35.)

Concerned with the prospect of future financial difficulties resulting from their health problems, Debtors sought legal advice from a local attorney in January 1999. (Tr. at 6–7, 10–11, 33.) That attorney referred them to their bankruptcy counsel, Lansing J. Roy. (Tr. at 33.) At that time

Debtors were both employed and were current on all of their financial obligations. (Tr. at 35–36.)

At their initial meeting Mr. Roy advised Debtors to sell their house in order to eliminate their large monthly mortgage payment. He advised them to finance a double-wide mobile home and set it up on an unencumbered vacant lot they had purchased in 1997. (Tr. at 37.)

Although Debtors attempted to sell their house, they did not follow Mr. Roy's advice with respect to financing a mobile home. Instead, in May 1999 Debtors entered into a contract to construct a house on the vacant lot for $74,483.20. (Debtors' Ex. 8.) Construction on the house began in August 1999. (Tr. At 16.)

Of the total contract price, Debtors paid $58,688.18 directly to the builder. (Debtors' Ex. 10; Tr. at 42, 43, 48.) Debtors managed the funding of the payments to the builder through a bank account designated as the Building Fund at Florida Credit Union. (Tr. at 29.) All of the money paid directly to the builder was drawn from the Building Fund. (Tr. at 29; Debtors' Ex. 6.) The funds from the Building Fund came from: 1) $2,731.85 in cash advances from credit cards, 2) $40,638.16 of proceeds from the liquidation of Debtors' non-exempt assets, and 3) $15,318.17 of proceeds from the liquidation of Debtors' exempt assets. (Debtors' Ex. 10.)

The builder authorized Debtors to pay some of the subcontractors and material providers directly. (Tr. at 43.) Debtors paid $19,741.78 to the subcontractors and material providers. (Trustee's Composite Ex. 1; Debtors' Ex. 10.)[1] All of these

---

1. The Trustee asserts that Debtors paid $21,979.10 to the subcontractors and material providers. Debtors assert they paid $19,430.66. Both figures are incorrect. The Trustee included two charges from Georgia

Carpet Outlet, one for $2,237.32 and one for $2,284.51. A review of the receipts and credit card statements indicates that Debtors initially purchased carpet from Georgia Carpet Outlet on July 31, 1999 for $2,237.32 with a

funds came from charges to or cash advances from credit cards. (*Id.*) Debtors charged an additional $4,934.22 to their credit cards for household items such as furniture, a bedspread and curtains, blinds, and a refrigerator. (Trustee's Composite Ex. 3; Tr. at 21, 24.) Debtors' new house is worth $83,000 to $84,000 and does not have a mortgage on it. (Tr. at 5.)

Aside from the construction and furnishing of the house and despite their concern about the prospect of future health and financial problems, during 1999 Debtors drew $39,350.00 in cash advances from credit cards, which they deposited into their CNB National Bank checking account. (Debtors' Exs. 4, 5.) During 1999 Debtors paid approximately $12,000.00 from that checking account toward their credit cards. (Debtors' Ex. 4.) During 1999 Debtors also charged $66,108.42 on their credit cards for purchases, balance transfers, and credit card convenience checks. (Trustee's Composite Exs. 2, 3, and 4.)[2] Although Mrs. Fretwell testified that "a lot of that is balance transfer checks" (Tr. at 20.), Debtors offered no other evidence or argument as to what portion represented balance transfers. Upon a thorough review of Trustee's Composite Exhibits 2, 3, and 4 the Court finds that $24,258.46 of the $66,108.42 represents balance transfers. In sum, Debtors charged well over $100,000.00 on their credit cards during 1999. During this time both debtors were working. Debtors' 1999 wages were $39,371.00. (Debtors' Ex. 21.) Mr. Fretwell also received $926.00 monthly in social security benefits and $726.35 monthly in pension benefits.

In late 1999 Debtors moved into their new house. Debtors' attempts to sell or rent their old house had been unsuccessful. Mrs. Fretwell testified that at that time Debtors expected to maintain their financial obligations as long as they were able to sell or rent their old house and maintain their jobs. (Tr. at 58.)

On January 14, 2000 Mrs. Fretwell wrote a letter informing her employer that she had applied for Social Security disability benefits and advised that her last day of full time employment would be January 28, 2000. (Debtors' Ex. 11.) Mrs. Fretwell indicated that her decision was based upon her doctor's September, 1998 recommendation. Although Mrs. Fretwell expressed an interest in part time employment, her employer was downsizing and declined to retain her as a part-time employee. (Tr. at 55.) On January 28, 2000 Debtors both lost their jobs. (Tr. at 14, 55.)

Debtors met again with Mr. Roy on February 10, 2000. (Tr. at 38.) Upon discovering that Debtors had been unable to sell their old house and had liquidated their assets and used credit cards to build a house instead of financing a double wide mobile home, Mr. Roy advised Debtors to compile a list of the source of the funds used to pay for the house. (Tr. at 40.) Mrs. Fretwell testified that she did not ask Mr. Roy why he requested such a list. (Tr. at 60.) Mr. Roy also advised Debtors that it would not be a good idea to file

---

cash advance check from First Card Visa as reflected on the August, 1999 statement. On November 3, 1999 Debtors purchased additional carpet from Georgia Carpet Outlet. The receipt indicates that Debtors had originally paid $2,237.32 and were being charged $47.19 (as reflected on their November 1999 Travelers credit card statement) for the additional carpet for a *total* of $2,284.51. The Trustee's Composite Exhibit 1 includes the $2,237.32 twice. Debtors' figure is incorrect because they list the total charges to Lowe's as $3,569.94. The 1999 Travelers Credit Card summary indicates Debtors spent $3,880.96 at Lowe's.

**2.** Pages 2 and 4 of Trustee's Composite Exhibit 4 include charges made during 1999.

bankruptcy at that time. (Tr. at 49.) Debtors paid Mr. Roy $500.00 for "retainer-research." (Debtors' Ex. 12, Check # 3871.)

During 2000 Debtors drew an additional $48,000.00 in cash advances on their credit cards which they deposited into their CNB National Bank checking account. (Debtors' Ex. 12.) They paid approximately $35,000.00 towards their credit cards. (*Id.*) Debtors also charged $17,041.25 on their credit cards for purchases, balance transfers, and credit card convenience checks. (Trustee's Composite Ex. 4.) Of that, $8,085.45 represented balance transfers. (*Id.*) Debtors remained current on their $1,637.00 mortgage payment.

In March 2000 Debtors took a trip to Las Vegas to attend their daughter's wedding. (Tr. at 25.) Although Debtors' daughter paid their airfare, Debtors charged more than $800.00 in trip expenses, including a $563.95 helicopter ride, on their SunTrust credit card. (Trustee's Composite Ex. 4 at 9.)

During October and November 2000 Debtors took a trip to Colorado, Wyoming, Montana, Idaho, Oregon, California, Nevada, and Utah. (Trustee's Composite Ex. 4, at 18–24.) On September 27, 2000, just prior to leaving for the trip, Debtors took a cash advance of $5,000.00 from their MBNA credit card. (Trustee's Composite Ex. 4 at 18.) During their travels, Debtors spent almost $3,000.00 on their credit cards. (Trustee's Composite Ex. 4 at 19, 21–24.)

Debtors stopped making payments in January 2001. Debtors filed their Chapter 13 bankruptcy petition on February 13, 2001. At that time Debtors owed over $187,000.00 on their credit cards. (Doc. 9, Schedule F.)

Debtors' amended Chapter 13 plan proposed to pay $457.04 per month for thirty six months. (Doc. 32.) At the confirmation hearing Debtors verbally amended their plan to extend the length to sixty months. (Doc. 44.) Debtors' fixed monthly income of $2,431.95 consists of Mr. Fretwell's BellSouth pension and Debtors' social security benefits. (Debtors' Ex. 17, Schedule I.) Debtors' monthly expenses are $2,013.31. (Debtors' Ex. 17, Schedule J.) Debtors' bankruptcy attorney's fees are $2,500.00. (Debtors' Ex. 17 Attorney Compensation Disclosure.) (Debtors' Ex. 12, Check # 3871.)

The Trustee asserts that the case was not filed in good faith and should therefore be dismissed pursuant to 11 U.S.C. § 1307(c). Alternatively, the Trustee objects to confirmation of Debtors' Second Amended Chapter 13 plan on the basis that it was not proposed in good faith as required by 11 U.S.C. § 1325(a)(3).

### CONCLUSIONS OF LAW

### MOTION TO DISMISS

The first issue before the Court is whether Debtors' case should be dismissed pursuant to § 11 U.S.C. § 1307(c). Section 1307(c) provides that upon request of a party in interest or the United States Trustee, a court may dismiss a chapter 13 for cause and sets forth a non-exclusive list of examples. Although it is not specifically listed as an example, lack of good faith in filing a bankruptcy petition constitutes cause for dismissal under § 1307(c). *In re Haning,* 252 B.R. 799, 807 (Bankr. M.D.Fla.2000). The requirement that a bankruptcy petition be filed in good faith is separate from the requirement that a Chapter 13 plan be proposed in good faith. *Id.* However, a motion to dismiss for lack of good faith is measured by the same standard for determining good faith at confirmation. *In re Bucco,* 205 B.R. 323, 324 (Bankr.M.D.Fla.1996). Although the Trustee's Motion to Dismiss was filed on

**750**

May 31, 2001, because of the Trustee's request for a continuance, the Motion to Dismiss and the confirmation hearing were held on October 11, 2001 and October 23, 2001 respectively. The Court elected to take the matters under advisement together. The Court will therefore treat the Motion to Dismiss as an Objection to Confirmation.[3]

### OBJECTION TO CONFIRMATION

In order to be confirmed, a Chapter 13 plan must comply with the requirements of 11 U.S.C. § 1325. The Trustee asserts that Debtors did not file their plan in good faith as required by § 1325(a)(3).[4] A debtor has the burden of proving that his plan was filed in good faith. *In re Petersen*, 228 B.R. 19, 24 (Bankr.M.D.Fla.1998) citing *In re Norman*, 162 B.R. 581, 583 (Bankr.M.D.Fla. 1993). A debtor's burden further increases if he seeks a Chapter 13 "superdischarge". *Id.* at 24.

The Eleventh Circuit has set forth the following non-exclusive factors for courts to consider in determining whether, under the totality of the circumstances, a Chapter 13 plan is proposed in good faith: (1) amount of the debtor's income from all sources; (2) living expenses of debtor and his dependents; (3) amount of attorney fees; (4) probable or expected duration of debtor's Chapter 13 plan; (5) motivations of debtor and his sincerity in seeking relief under provisions of Chapter 13; (6) debtor's degree of effort; (7) debtor's ability to earn and likelihood of fluctuation in his earnings; (8) special circumstances such as inordinate medical expense; (9) frequency with which debtor has sought relief under the Bankruptcy Reform Act and its predecessors; (10) circumstances under which the debtor has contracted his debts and his demonstrated bona fides, or lack of same, in dealings with his creditors; (11) burden which plan's administration would place on trustee; (12) any exceptional circumstances in the case; (13) the type of debt and whether it would be non-dischargeable in chapter 7; and (14) the accuracy of the plan's statements of debts and expenses and whether any inaccuracies are an attempt to mislead the court. *Kitchens v. Georgia R.R. Bank and Trust Co. (In re Kitchens)*, 702 F.2d 885, 888 (11th Cir. 1983).

"Congress enacted chapter 13 to provide a highly desirable method for dealing with the financial difficulties of individuals. It creates an equitable and feasible way for the honest and conscientious debtor to pay off his debts rather than having them discharged in bankruptcy." *Jim Walter Homes, Inc., v. Saylors (In re Saylors)*, 869 F.2d 1434, 1436 (11th Cir.1989) (quoting H.R.Rep. No. 193, 86th Cong., 1st Sess. 2 (1959)). The Eleventh Circuit further stated that "[t]he good faith requirement of 11 U.S.C. § 1325(a)(3) is sufficient to prevent undeserving debtors from using this procedure, yet does not prevent deserving debtors from using the procedure." *Id.*

---

**3.** The Court recognizes that a party seeking dismissal under § 1307(c) bears the burden of proof. *See In re Love*, 957 F.2d 1350, 1355 (7th Cir.1992). However, a finding by the Court that the Trustee failed to prove by a preponderance of the evidence that the petition was not filed in good faith is not tantamount to a finding that Debtors proved by a preponderance of the evidence that their plan was filed in good faith. The Court's construal of the Motion to Dismiss as an Objection to Confirmation will therefore not prejudice Debtors.

**4.** "(a) Except as provided in subsection (b), the court shall confirm a plan if—

(3) the plan has been proposed in good faith and not by any means forbidden by law" 11 U.S.C. § 1325(a)(3).

### Amount of Debtors' Income from all Sources and Debtors' Living Expenses

Debtors' $2,431.95 monthly income is from pension and social security payments. Debtors' monthly expenses of $2,013.31 are reasonable.

### Amount of Attorney's Fees

Debtors' attorney's fees of $2,500.00 are reasonable.

### Duration of Chapter 13 Plan and Degree of Effort

Debtors' Amended Chapter 13 plan was for 36 months with approximately $900.00 being paid to unsecured creditors. Debtors orally amended their plan at the confirmation hearing to extend the plan to sixty months to provide for approximately $11,800.00 to unsecured creditors. Debtors' last minute extension of plan payments, some four months after their Amended Chapter 13 plan was filed, demonstrates a belated attempt to settle with the trustee rather than a sincere effort to pay their unsecured creditors.

### Debtors' Ability to Earn and Likelihood of Fluctuation in Earnings

Given their health problems, there is little likelihood that Debtors' earnings will increase.

### Special Circumstances Such as Inordinate Medical Expenses

Debtors do not have inordinate medical expenses. Although Debtors' inability to maintain employment is attributable to their medical problems, the bankruptcy filing was precipitated by Debtors' profligate spending rather than their medical problems. Debtors' medical problems surfaced during 1998, before they consulted with a bankruptcy attorney.

### Previous Bankruptcy Filings and Burden on Trustee

Debtors have not previously sought bankruptcy protection and the administration of Debtors' plan would not place an undue burden on the trustee.

### Exceptional Circumstances

The Eleventh Circuit noted that other factors or exceptional circumstances may support a finding of good faith in the proposal of a Chapter 13 plan despite no or only a nominal repayment to unsecured creditors. *Kitchens*, 702 F.2d at 889. The Court is cognizant of Debtors' ages, health problems, and fixed income. In light of the fact that Debtors were aware of their health problems and knew their continued employment was questionable before they embarked on a two-year spending spree, the Court does not find such circumstances exceptional.

### Circumstances under which Debtors Contracted their Debts and Demonstrated Bona Fides or Lack Thereof in Dealing With Creditors

The circumstances under which Debtors contracted their debts are troubling. After meeting with Mr. Roy in early 1999, Debtors disregarded Mr. Roy's advice to finance a home. Instead they elected to fund the construction of a home with the proceeds of their mostly non-exempt liquidated assets as well as almost $25,000.00 in credit card charges. Additionally, Debtors drew almost $40,000.00 in cash advances on their credit cards which they deposited directly into their checking account. Of that, they paid only $12,000.00 toward their credit cards. Moreover, Debtors incurred an additional $66,000.00 of credit

card debt, of which only $24,000.00 represented balance transfers. Mrs. Fretwell's testimony that Debtors expected to maintain their financial obligations as long as they were able to sell or rent their old house and maintain their jobs is preposterous. If Debtors had sold their large home, they would have reduced their expenses by approximately $22,000.00 annually. During 1999, Debtors' cash withdrawals alone, not including balance transfers and purchases, exceeded their housing expenses by almost $18,000.00. Debtors' profligate spending is even more troubling in light of the fact that it occurred after Debtors consulted a bankruptcy attorney because of their concern about health and financial problems. Debtors knew their continued employment was questionable. They also knew they could not pay back their credit cards if they were not employed.

Recognizing the potential consequences of Debtors' conduct, Mr. Roy advised Debtors during their February 10, 2000 meeting to compile a list of the source of the funds used to pay for their newly constructed house and that it would not be a good idea to file bankruptcy at that time. Debtors took affirmative steps to stave off collection efforts during the filing "moratorium" by making their credit card payments with cash advances from other credit cards. To that end, they drew $48,000.00 in cash advances and paid $35,000.00 toward their credit cards. Additionally, Debtors continued making their $1,637.00 monthly mortgage payments. Despite their intent to file bankruptcy once the "moratorium" was lifted, Debtors continued making purchases on their credit cards, spending over $4,000.00 on vacations alone.

### Debtors' Motivation and Sincerity in Seeking Relief and Type of Debt to be Discharged and Whether it Would be Nondischargeable under a Chapter 7

The Court finds that Debtors were not sincere in seeking Chapter 13 relief. Debtors filed Chapter 13 not in a sincere effort to repay their creditors but rather to avoid dischargeability issues that may have arisen in a Chapter 7 case. A Chapter 13 plan which serves no purpose other than to discharge an otherwise non-dischargeable debt evidences a lack of good faith. *In re Petersen*, 228 B.R. 19, 26 (Bankr.M.D.Fla. 1998). Although it makes no explicit determination, the Court finds it likely that some, if not all of the credit card debt, would be excepted from Debtors' discharge pursuant to § 523(a)(2)(A). *See AT & T Universal Card Services, Corp. v. Reneer (In re Reneer)*, 208 B.R. 731, 735 (Bankr.M.D.Fla.1997) (listing factors to consider when determining misrepresentation of intention or ability to pay).

Debtors assert that they would not have faced an objection to their discharge because all of the "triggering events", the conversion of non-exempt assets into an exempt homestead, occurred more than a year prior to the filing of the petition.[5] However, Debtors' postponement of their bankruptcy filing to ensure that the "triggering events" had occurred more than a year prior, was accomplished only by the incurrence of an additional $48,000.00 in credit card cash advances with which to service their credit card debt. Such conduct may have salvaged Debtors' dis-

---

5. While the Court has held that under Florida law a homestead exemption can not be disallowed on the basis that a debtor fraudulently converted non-exempt assets into an exempt homestead with the intent to defeat creditors' claims, the Court recognizes the existence of other remedies such as an objection to discharge. *See In re Clements*, 194 B.R. 923, 926–927 (Bankr.M.D.Fla.1996).

charge in a Chapter 7, but it certainly calls into question their bona fides in dealing with their creditors.

### Accuracy of Plan's Statements of Debts and Expenses and Whether any Inaccuracies are an Attempt to Mislead the Court

Debtors' schedules accurately reflect their debts and their plan accurately reflects their expenses.

### CONCLUSION

In light of the circumstances under which Debtors contracted their debts, their lack of bona fides in dealing with their creditors, their lack of motivation and sincerity in seeking relief, and the likelihood that some, if not all, of their unsecured debt would be non-dischargeable in a Chapter 7, the Court finds that Debtors failed to prove that they proposed their plan in good faith. The Court will therefore enter an order denying confirmation.